STOKELY *v.* STATE *ex rel.* KNOX, ATTY.-GEN., *et al.**

(In Banc. Feb. 13, 1928.)

[115 So. 563. No. 26721.]

MINES AND MINERALS. *Board of trustees for state insane hospital had no power to execute oil and gas lease on lands owned by hospital (Hemingway's Code 1927, sections 5768-5797).*

Board of trustees for the state insane hospital *held* to have had no power, under Hemingway's Code 1927, sections 5768-5797 (Code 1906, sections 3187-3210), to execute an oil and gas lease on lands owned by hospital, conveying the oil and gas under land and granting exclusive right to conduct operations to produce and dispose of the same, since the effect thereof was a conveyance of an interest in land.

*Corpus Juris-Cyc. References: Asylums, 5CJ, p. 1419, n. 48 New; Mines and Minerals, 40CJ, p. 1059, n. 12; Use, 39Cyc, p. 845, n. 72, 78.

APPEAL from chancery court of Hinds county, First district.

HON. V. J. STRICKER, Chancellor.

Suit by the state, on the relation of Rush H. Knox, Attorney-General, and others, against Mrs. Ella Rawls Reader Stokely. Decree for plaintiffs, and defendant appeals. Affirmed.

*Butler & Snow,* for appellant.

What powers have the trustees of the institution under the statutes? Going back to chapter 87, Code of 1892, it will be seen that the institution is continued with all the privileges conferred and duties enjoined upon it by law. We are then required to look to prior acts to determine what privileges and duties are enjoined by law, and we find that under the Code of 1871 and 1880, it is given "all the rights, powers and privileges incident to such

a body and necessary and proper to accomplish the end of its organization.'' Under the Code of 1892, Code of 1906, and present statutes, the corporation and trustees have all the powers which they had under the Code of 1880 and the Code of 1871, in connection with the management and control of the property of the institution. Under all of these statutes, the trustees have charge of the interests of the hospital. We do not mean by this to say that under the Code of 1892, the trustees would have power to ''dispose of'' the real property of the institution, meaning thereby the right to convey the fee-simple title to the real property of the institution.

What we do mean is that the institution may hold and use all property belonging to it or which may be given to it, and that the trustees have general charge of the interests of the hospital and have general authority to manage and direct its affairs. We desire to call the court's attention to the fact that the contract in question is not a sale of real estate; second, that it is not a lease of real estate. On the other hand, the resolution recites that it is the privilege and duty of the trustees to make the best use of the property; that it would be to the best interest of the institution that a test be made for oil and gas in this territory; that Mrs. Reader offers to make a test of the hospital lands for oil and gas for seven-eighths of the oil found; and it is adjudged to be to the best interest of the institution to have the test made. Wells are to be located at points not inimical to the interests of the institution. Mrs. Reader is to bear all the expense incident to the enterprise; all gas found (with immaterial exceptions) is to belong to the institution and Mrs. Reader is to deliver to the institution, without cost, one-eighth of the oil found. In other words, the contract, as we see it, is one whereby the trustees, on behalf of the institution employs Mrs. Reader (now Mrs. Stokely) without cost or expense to the institution, to test out certain parts of the large tract of land for oil and gas, and

that too under a contract where the interests of the institution are carefully guarded in such a way as not to interfere with the ordinary operation of the institution.

It is true that the exclusive privilege is conferred upon Mrs. Reader and her assigns to make the test, but this is a reasonable requirement when it is understood that she was to make a large outlay of money in making the test. The trustees of the institution have the authority under the statute to determine the use to which the lands shall be put.

We must remember that here we are dealing with the bare question of power. No question of bad faith is involved. Here was some thirteen hundred acres of land, only a small part of it occupied by buildings and improvements. Comparatively a small part occupied by vegetable gardens, farms, etc.; most of it not actually needed for use by the institution. Under these circumstances, would not the board have the power to lease out a part of the land for pasturage and other purposes? Would it not have the power to clear it up and bring it into a state of improvement and cultivation; if by chance a mineral well or spring was discovered or developed upon the property, would it not have the right to dispose of water.; would it not have the right to do such other things and make such other uses of the property as a reasonable prudent owner of the fee would make, taking into consideration the character, extent and location of the property? Is the board helpless? Can it do nothing but produce chickens, eggs and pigs and vegetables and grain? We submit that under the statute the board is given much broader power than that contended for by the state.

The trustees are not to be likened to executors, administrators, guardians or other statutory trustees, nor are they to be likened to trustees created by will or other writing to hold and manage the property for a limited time. They are more nearly like in their powers, duties

and responsibilities to the directors of a corporation. The directors cannot alienate substantially all of the corporate property, but when it comes to the control and management of the corporate affairs so long as the stockholders do not limit their authority, the directors have a very large power and discretion. The rule is laid down as follows: ''The board of directors or trustees is the body usually intrusted with the authority to conduct the business of the corporation, and it may be said that the directors have plenary authority to transact all the ordinary business of the corporation within the scope of its charter powers. Unless their authority is restricted, and what they do within the scope and purposes of the corporation the corporation does—. . . The power so vested in the directors includes the general power, unless restricted to transfer or convey the property of the corporation both personal and real.'' 7 R. C. L., 437; to the same effect see 14 C. J. 81, 83.

Little, if any, help is to be had from adjudicated cases. We are dealing with fundamental general propositions. The board of trustees is given general powers of management and direction of the corporate affairs and property of the institution. The institution has all the powers necessary and proper to accomplish the end of its organization, and under the statutes the trustees are given charge of the property and of the interests of the institution and enjoined with the management and direction of its affairs and authorized to do all things not contrary to law. A broader discretion and power could hardly be conferred.

*J. L. Byrd,* Assistant Attorney-General, for appellees.

The invalidity of the contract or lease is based upon the proposition that the trustees have only such power as is vested in them by the act creating the board of trustees, or such power as is necessarily implied, and that they cannot use the property of the institution except for the benefit of the institution, and the language

of the statute creating the hospital and providing for the trustees limits them to the use of all real estate for the benefit or use of said institution. There are several acts with reference to the state insane hospital beginning with the original act establishing it, which is chapter 66, Laws of 1848; and including chapter 12, Code of 1857; chapter 41, Code of 1871; chapter. 13, Code of 1880; section 2807, Code of 1892, and chapter 92, Code of 1906.

The appellant can only justify the actions of the board of trustees in making the contract in question here on the theory that it is for the best interest of the institution. We submit that the chancellor was correct in holding that it was not for the best interest of the institution and not within the scope of the authority of the board of trustees. We can conceive of no possible good whatever that could be gotten for the benefit of the patients of the insane hospital by exploring for oil all over the land on which the institution is situated. On the other hand, it would be more like to disturb the patients and be a detriment to them than a benefit. If oil were discovered on the lands the money would not go to the insane hospital but would go to the state treasury, and the Legislature might appropriate a part of the money to the insane hospital, or it might not, all being a matter of conjecture.

The trustees of his institution realized that they did not have a right to lease the land for oil purposes, so they attempt to do indirectly that which they could not do directly, and instead of leasing the land they entered into what they call a contract for exploration of the property for oil and gas, but which amounts to exactly the same thing, and it puts a burden upon the property which the court will readily see casts a cloud on the title to the property. It is dressed up like a contract, but in truth and in fact it is nothing but a lease for the exploration of the land. In 40 C. J. 584, 991, the general

rule is stated that where it is apparent that the intention in making the contract was to lease the mining property it will be so construed and not construed as a mere contract of employment. The board of trustees had no authority whatever, either express or implied, to make such a lease of contract, and that their action was void.

Argued orally by *Geo. Butler,* for appellant, and *J. A. Lauderdale,* for appellee.

COOK, J. The state, on the relation of the Attorney-General and the state insane hospital improvement, removal, and land sale commission, instituted this suit in the chancery court of the First district of Hinds county seeking to cancel a certain contract or lease theretofore made by the trustees of the state insane hospital with the appellant, Mrs. Ella Rawls Reader Stokely, which said contract or lease had been assigned to the Standard Shale Products Corporation. The bill sought to cancel this contract or lease on two grounds: First, that the trustees of the insane hospital had no authority to make such a contract or lease. And second, that the lessee had not performed her part of the said contract or lease.

The appellants filed an answer to the bill of complaint, and in their answer demurred to that portion of the bill which charged that the trustees were without authority to make the contract or lease, assigning as grounds of demurrer, first, that the bill of complaint states no fact showing or tending to show that the board of trustees of the state insane hospital is without authority to make the contract in question; and second, no reasons are given, either of law or fact, for the invalidity of said contract. The answer also averred that, on the date in question:

"The state insane hospital then and there owned the lands described in the bill of complaint, and then and there the trustees of said hospital had the authority to use said property for said institution, and were author-

ized to make such use thereof as a reasonable and prudent person would make of similar property, taking into consideration the extent, location, and nature of said property, and the needs and requirements of said institution, and that acting in pursuance of their authority the board of trustees of said hospital did on or about the 5th day of December, 1924, enter into a contract with the defendant, Ella Rawls Reader Stokely, then Ella Rawls Reader, whereby and wherein the said Ella Rawls Reader agreed to test and explore, at her own expense, for oil and gas on said property, and to drill, at her own expense, on or before March 5, 1925, for the purpose aforesaid, a well on said property, and in consideration thereof the said hospital, acting by and through its board of trustees, agreed to give the said Ella Rawls Reader seven-eighths of all the oil found or produced or taken from said land, and the said Ella Rawls Reader on her part further agreed to deliver to the credit of said hospital, free of cost, in the pipe line or tank in which she might connect her wells, the equal of one-eighth of all oil produced and saved from said land, and agreed to purchase from said hospital, with certain exceptions not necessary here to set out, all gas found or produced or taken from said property at and for the sum of eight cents per thousand cubic feet, measured at the wells, payments to be made for said gas every three months, all of which will more fully appear by reference to the contract made Exhibit B to the bill of complaint.''

The appellees filed a motion to test the legal sufficiency of that part of the answer above quoted, and, upon the hearing of the demurrer and this motion, the demurrer was overruled and the motion was sustained, the answer being adjudged insufficient in point of law and not amendable, and from this decree this appeal was granted to settle the principles of the case.

For an understanding of the question to be decided, the facts necessary to be stated are substantially as follows:

During the year, 1924, and for some time prior thereto, the state insane hospital owned a large tract of land consisting of more than one thousand three hundred acres, lying immediately north of the corporate limits of the city of Jackson, on which was located the numerous buildings and the equipment of the institution, and on which the various activities of the institution, including stock, truck, and produce farms and poultry yards, are located and carried on. On or about the 5th day of December, 1924, the board of trustees of said hospital passed the following resolution:

"Wherefore it appears that the 'state insane hospital' has an opportunity to secure a test for oil and gas in the territory surrounding the hospital, and whereas, proceeding under the privilege and duty to make the best use of said property enjoined upon said trustees, it appears to the board of trustees that it would be to the best interest of the state insane hospital that such a test be made in this territory, and wherefore Ella Rawls Reader offers to make a contract with said board to test the state insane hospital lands for oil and gas for seven-eighths of all the oil found on said lands and the privilege of purchasing all the gas found on said lands, and wherefore it appears to the best interest of the institution to have such a test made:

"Therefore, be it resolved that, in consideration of one dollar and the promise and agreement on behalf of Ella Rawls Reader to test for oil and gas the lands belonging to the 'state insane hospital,' the president and secretary of this board be and they are hereby authorized and directed to execute a contract with Ella Rawls Reader, whereunder and whereby she is to test the territory at her own expense and to receive as her compensation seven-eighths of all oil found on said state insane hospital lands.

"It is understood and agreed, however, that in the initial drilling for testing the lands of the institution such

locations shall be at points not specially inimical to the interest of the institution as may be decided by the superintendent.

"Said contract to be identical with the one attached hereto.

"By signing of said contract by the president and secretary of this board, the board of trustees approves said contract.

"This contract is expressly made assignable in whole and in part."

The instrument executed in pursuance of the foregoing resolution provided that, in consideration of Ella Rawls Reader agreeing to test for oil and gas at her own expense, and the consideration of her agreeing to drill for oil on some part of the state insane hospital lands at her own expense, the trustees of said hospital agreed to give to her seven-eighths of all the oil found, or produced or taken from the lands of said hospital, the lands being therein specifically described.

In consideration of her employment to develop the said lands for oil and gas, the said Ella Rawls Reader agreed to deliver to the credit of the trustees, in the pipe lines or tanks to which she might connect her oil wells, the equal of one-eighth part of all oil produced and saved from said lands. It was further provided that all gas found or taken from the property was to belong to the trustees, but Mrs. Reader was given the right to purchase all or any part of it (with certain immaterial exceptions) at eight cents per thousand cubic feet, measured at the well. It was further provided that no well should be located within certain limited territory or nearer than two hundred feet to any dwelling house or barn on said premises without the written consent of the trustees, and the said Ella Rawls Reader and her assigns were granted the exclusive privilege of entering all of said lands for the purpose of drilling for oil or gas and conducting and operating all business in connection therewith.

The action of the court below upon the pleadings presents for decision the question of whether or not the board of trustees of the said hospital, who are charged with the control and management of the institution and its property, was authorized to execute the instrument which it is now sought to cancel.

The state insane hospital was established by chapter 66, Laws of 1848, which appears in Hutchinson's Code, at page 306, section 6, and it was there provided that:

"As soon as the buildings of said asylum shall be ready to receive patients, the Governor shall appoint five directors of said asylum, who shall have full power to make and ordain all such by-laws, rules, and regulations not inconsistent with the Constitution of the state or this act, which they may deem necessary and proper for the good government and management of said asylum; and said directors shall appoint a medical superintendent, and employ a steward and matron, and all such nurses as they may think necessary; and shall make a full and detailed report of all the affairs of said institution to each session of the legislature; and shall hold their offices for two years, and until their successors are appointed and qualified."

The institution was continued by chapter 12 of the Revised Code of 1857, which provided for a board of trustees who "shall manage and direct the concerns of the institution, and make all necessary by-laws and regulations, not inconsistent with the Constitution of the state or of this act, and shall have power to receive, hold, dispose of, and convey all real and personal property conveyed to them, by gift, devise or otherwise, for the use of said institution," and who "shall have charge of the general interests of the institution." Articles 1 and 2.

Section 2073 of the Code of 1871 provided that:

"The Mississippi State Lunatic Asylum, heretofore established, shall continue to exist as a body politic and

corporate, by that name and style, with all the rights, powers and privileges incident to such a body, and necessary and proper to accomplish the end of its organization, and may receive, hold and dispose of, all real and personal property, conveyed to it.''

While section 2079 of that Code provided that:

''The trustees shall manage and direct the affairs of the asylum, and make all necessary by-laws and regulations for the control and government of said institution, not inconsistent with the Constitution and laws of this state.''

Under the provisions of chapter 13, Code of 1880, the institution and its board of trustees were continued in substantially the same terms and with the same powers as were fixed and conferred by the Code of 1871.

Section 2807, Code of 1892, reads as follows:

''The lunatic asylum heretofore established at Jackson, with the annex for colored patients authorized by the Act of February 24, 1890, shall continue to exist as a body politic and corporate, under the name of the 'State Lunatic Asylum,' with all the privileges conferred and duties enjoined on it by law; and it may receive and hold and use, as required by law, all the property, real and personal, belonging, or which may be given, to it for the purposes of its establishment.''

Section 2812 of the Code of 1892 provides that:

''The board of trustees shall have charge of the interests of the asylum, and shall manage and direct its affairs and make all proper by-laws and regulations for its control and government not contrary to law.''

Chapter 92 of the Code of 1906, and chapter 134, Hemingway's Code 1927, continue the institution and its board of trustees upon the same terms and with the same powers, in so far as they are here material, as were fixed or conferred by the Code of 1892.

From an examination of these statutes it will be noted that prior to the adoption of the Code of 1892, the in-

stitution, through its board of trustees, had the authority to dispose of the real and personal property belonging to it, but since the adoption of that Code there has been no express provision for the trustees to sell or dispose of any of the property of the institution.

The question as to whether or not, under the powers and the authority conferred on the board of trustees "to have charge of the interests of the asylum, and manage and direct its affairs," the board of trustees, taking into consideration the extent, location, and nature of the property, and the needs, requirements, and best interest of the institution, had the implied power and authority to make and execute the instrument in question will be determined by a consideration of the legal effect of the instrument and the nature and character of the estate conveyed thereby.

In consideration of the grantee agreeing to explore, test, and develop the said lands for oil and gas, the instrument in question granted to her, and her assigns, the exclusive right to enter and possess the land itself, with no limitation upon the number of wells the grantee might sink, or the extent of her operations in that connection, and consequently no qualification of her right of possession of all such parts of the surface of the land as might be necessary to its full use by the grantee for the purposes named, except that no well should be drilled on the territory between the administration building and the building adjacent thereto and the homes of the employees of the institution, or nearer than two hundred feet to any dwelling house or barn on said premises without the consent of the trustees. Under this instrument the title to seven-eighths of the oil in the land is vested in the grantee, while she is given the exclusive right to purchase all gas produced therefrom at a fixed and unchangeable price. Under the provisions of the instrument the rights conferred thereby continue so long as oil or gas, or either of them, is produced on said land,

provided drilling was commenced by a fixed date. Under this provision, the termination of the grant is wholly uncertain, and the rights granted may endure forever.

From a practical standpoint, the rights of the grantee under an instrument which conveyed the oil and gas under the land and granted the exclusive right to conduct operations to produce and dispose of the same, or under an instrument which leased, demised, and let the land for the same purpose, would be no other, different, or greater than the rights of the grantee in the instrument here involved, and we are of the opinion that this instrument is, in legal effect, a lease of the land and a conveyance of an interest therein. It follows from the views herein expressed that, in the absence of legislative authority so to do, the board of trustees was without the power and authority to make the contract in question.

For an able and elaborate discussion of an analogous question, and a collation of the authorities which support the view herein expressed, see the case of *Stephens County* v. *Mid-Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566.

The decree of the court below will therefore be affirmed.

*Affirmed.*

ETHRIDGE, J. (dissenting). I think the construction placed upon the powers of the trustees of the insane hospital is too narrow and restrictive, and that it would be better to hold that the board of trustees had the power to execute the contract here involved.

Section 5768, Hemingway's Code 1927 (section 3187, Code of 1906), provides that the state insane hospital heretofore established shall continue to exist as a body politic and corporate, with all the privileges conferred and duties enjoined on it by laws; and it may "receive

and hold and use, as required by law, all property, real and personal, belonging or which may be given to it for the purposes of its establishment.'' Section 5771, Hemingway's Code 1927 (section 3190, Code of 1906), as amended by the Laws of 1908, chapter 183, creates a board of trustees and provides that the control and management of the insane hospital shall be vested in such board. Section 5773, Hemingway's Code 1927 (section 3192, Code of 1906), provides that the trustees shall have charge of the hospital, and shall manage and direct its affairs and make all proper by-laws and regulations for its control and government not contrary to law.

The word ''use'' in the first section above named is a word of comprehensive signification, and, in my opinion, warrants the contract here involved. This word is defined in 39 Cyc. 845, as follows:

''Usefulness, utility, advantage, productive of benefit; the act of employing anything or applying it to one's service, application, employment, conversion to some purpose; the act of being so employed or applied; application, employment, conversion to some purpose, the act of using, employment, as of means of material for a purpose; application to an end, particularly a good or useful end; a synonym of benefit.''

In the note to this volume cases are cited furnishing examples of the meaning of the word ''use,'' and at the top of note on page 846 it is said:

''It is the ancient definition for every form of beneficial or equitable ownership. There is no more all-embracing term for any estate which is less than legal'' (citing Matter of Scharmann, 63 Misc. Rep. 640, 118 N. Y. S. 687). ''In its general and popular acceptation, the term refers to a temporary occupancy of land, rather than to an estate in it, coupled with the power of alienation. *Fay* v. *Fay,* 1 Cush. (Mass.), 93, 104.''

The word ''use'' also has been defined in 29 Am. and Eng. Encyc. of Law, p. 439, as follows:

"To use is to make use of, to convert to one's service; to avail one's self of; to employ; to put to a purpose, as to use a plow, to use a chair, to use a book, to use time, to use flour for food; to accustom to and habituate. One of common meanings of the noun 'use' is usefulness, utility, advantage, productive of benefit. In the notes will be found a number of phrases in which the word 'use' or some of its derivatives which have been constructed by the courts."

At the top of page 444 of this last-named book, under "Gifts, Bequests, and Conveyances of Use of Property," I find the following:

"As a general rule the use of a thing does not mean the thing itself, but means that the user is to enjoy, hold, occupy, or have in some manner the benefit thereof. If the thing to be used is in the form of real estate, the use thereof is its occupancy or cultivation, etc., or the rent which can be obtained for its use. If it is money or its equivalent, generally speaking, it is the interest which it will earn. A wider signification, however, is sometimes given to the word,"

—and this book then states the nature of such enjoyment of property by the tenant for life.

It must be remembered that the insane hospital owns land in fee simple, and the evident purpose of the legislature was to permit authority to use this land in any legitimate way for the benefit of the hospital, and the legislature evidently only meant to restrict the alienation of the *corpus* of the soil itself. The word "use" therefore should be given its most liberal signification to render the land of the highest practical utilization to the institution.

The contract itself provides every reasonable safeguard to protect the state or the institution in the carrying out of the contract, and the terms therein imposed, or contracted for by the parties, are as liberal to the institution as is customary in such leases, as will appear

from a statement in one of the cases collected on this proposition. The majority opinion relies upon the case of *Stephens County et al.* v. *Mid-Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566. This case seems to hold that oil lying beneath the surface is to be treated as minerals, such as coal, iron, and the like. There is an important difference between oil and gas lying under the soil and minerals of the nature of coal, iron, etc. The latter are still, immovable, and can be removed only by going into the earth upon some point of the land and removing it. It cannot be removed in any other way. There must be an invasion of the soil by the person taking it, in order to remove it. While as to oil and gas, it may be taken from the land by an adjoining landowner, who may bore for it on his own land and draw or pump it from the reservoir, and thus extract oil and gas not only that which lies under his own tract, but also that which lies under contiguous tracts.

Beginning on page 586 of 29 A. L. R., there is a case note by the editor in which are cited cases belonging to the majority rule upon the subject. However, there is a minority rule on page 589 in which are cited cases decided by the United States Supreme Court which hold differently, and which recognize a distinction between oil and gas, and other minerals such as coal, iron, etc.; and there are several cases which take the view that:

"Oil and gas are somewhat in the nature of animals *feræ naturæ* or of waters percolating through the earth, and are of vagrant nature and liable to escape, and therefore that while in place they are not the subject of an absolute, but only of qualified, ownership until reduced to possession, and that there can be no transfer of title to them before they have been so reduced." *Brown* v. *Spilman*, 155 U. S. 665, 15 S. Ct. 245, 39 L. Ed. 304; *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729, 20 Morr. Minn. Rep. 466; *Walls* v. *Midland Carbon Co.*, 254 U. S. 300; 41 S. Ct. 118, 65 L. Ed. 276;

*People's Gas Co.* v. *Tyner,* 131 Ind. 277, 31 N. E. 59, 16
L. R. A. 443, 31 Am. St. Rep. 433, 17 Morr. Min. Rep.
481; *Heller* v. *Dailey,* 28 Ind. App. 555, 63 N. E. 490;
*Wagner* v. *Mallory,* 169 N. Y. 501, 62 N. E. 584, 22 Morr.
Min. Rep. 42; *Shepherd* v. *McCalmont Oil Co.,* 38 Hun
(N. Y.), 37; and other cases.

The reasoning of the Supreme Court of the United
States upon this proposition in the several cases cited is
very convincing, and seems to me to be, by far, the most
reasonable view to take. I never feel lonesome, and sel-
dom doubtful, when in company with the Supreme Court
of the United States. Its Judges are usually of the most
profound learning, and they are diligent in the exami-
nation and consideration of their cases. At page 247 of
15 S. Ct. of *Brown* v. *Spilman* (155 U. S. 669), the court
said:

"The subject of the grant was not the land, certainly
not the surface. All of that except the portions actually
necessary for operating purposes and the easement of
ingress and egress was expressly reserved to Taylor. The
real subject of the grant was the gas and oil contained in
or obtainable through the land, or rather the right to
take possession of the gas and oil by mining and boring
for the same. Petroleum gas and oil as substances of
a peculiar character, and decisions in ordinary cases of
mining, for coal and other minerals which have a fixed
*situs,* cannot be applied to contracts concerning them
without some qualifications. They belong to the owner
of the land, and are part of it, so long as they are on it
or in it or subject to his control; but when they escape
and go into other land, or come under another's control,
the title of the former owner is gone. If an adjoining
owner drills his own land, and taps a deposit of oil and
gas, extending under his neighbor's field, so that it comes
into his well, it becomes his property. *Brown* v. *Van-
dergrift,* 80 Pa. 147; *Westmoreland & C. Nat. Gas Co.'s*
appeal (130 Pa. 235), 18 A. 724 (5 L. R. A. 731).''

In *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; 20 Morr. Min. Rep. 466, the court had occasion to consider the question as to the nature of the ownership of gas and oil beneath the soil in an attack upon the constitutionality of the statute enacted by the state of Indiana referred to in said case. It was there held to be unlawful to permit a flow of gas or oil from a well to escape into the open air, without being confined within the well or proper pipes, or other safe receptacle for more than two days after gas or oil shall have been struck. It was considered by the court in that case that if the oil and gas were the absolute property of the owner who had bored the well, and he was permitting them to escape, then it would be within the protection of the due process of law and equal protection clauses of the Fourteenth Amendment. At page 581 of 20 S. Ct. (177 U. S. 202), the court in this case said:

"The confusion of thought which permeates the entire argument is twofold: First, an entire misconception of the nature of the right of the surface owner to the gas and oil as they are contained in their natural reservoir, and this gives rise to a misconception as to the scope of the legislative authority to regulate the appropriation and use thereof. Second, a confounding, by treating as identical, things which are essentially separate; that is, the right of the owner of land to bore into the bosom of the earth, and thereby seek to reduce the gas and oil to possession, and his ownership after the result of the borings has reached fruition to the extent of oil and gas by himself actually extracted and appropriated. In other words, the fallacy arises from considering that the means which the owner of the land has a right to use to obtain a result is in legal effect the same as the result which may be reached. . . . Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may

be reduced to actual possession or become the property
of a particular person, cause them to be exceptions to the
general principles applicable to other mineral deposits,
and hence subject them to different rules? True it is
that oil and gas, like other minerals, are situated beneath
the surface of the earth, but except for this one point of
similarity, in many other respects they greatly differ.
They have no fixed *situs* under a particular portion of
the earth's surface within the area where they obtain.
They have the power, as it were, of self-transmission.
No one owner of the surface of the earth, within the area
beneath which the gas and oil move, can exercise his right
to extract from the common reservoir, in which the sup-
ply is held, without, to an extent, diminishing the source
of supply as to which all other owners of the surface
must exercise their rights. The waste by the owner,
caused by a reckless enjoyment of his right of striking
the reservoir, at once, therefore, operates upon the other
surface owners. Besides, whilst oil and gas are different
in character, they are yet one, because they are unitedly
held in the place of deposit. In *Brown* v. *Spilman,* 155
U. S. 665, 669, 670, 15 S. Ct. 245, 247, 39 L. Ed. 304, 305,
these distinctive features of deposits of gas and oil were
remarked upon.''

In the light of the above cases, the court has further
discussed the question, but I will not take up space to
set the language out in this opinion.

It is manifest, however, that wise husbandry of the
state's property would require those in charge to act
promptly, and secure such oil as might be found, before
others occupying adjoining lands could tap the reservoir
and withdraw from the earth the entire deposit of oil or
gas, leaving the state with nothing.

At the time the contract here involved was made, there
was much activity in buying leases in this territory, and
great hopes were indulged that some well might be dug
that would produce a gusher. There is still, in parts of

the state, experimental drilling for gas and oil, and great hopes are entertained that this will be successful and oil may be struck. Should deposits be found near the state's property, or property belonging to the different institutions of the state, where no specific provision has been made to authorize contracts like those here involved, it will be possible for adjoining owners to extract all the oil or gas from the reservoir before the state could act, as it would be necessary to assemble the legislature and get specific authority at each institution to make contracts or to develop lands themselves. The risks involved in experimental development are great, and it is not likely that the state will enter that field. The contract in the present case is highly beneficial to the state, and is as liberal as any of those in the various decisions which have set out the contracts involved in them. Where the state owns land in fee, and no other person's rights are involved, liberal construction should be placed upon the power of the managing officers of these institutions, to utilize the land for any particular advantage.

It seems to me that the principle involved in the sixteenth section cases ought to be applicable in the present case.

In section 211 of the state Constitution 1890, preserving to the people the sixteenth sections for school purposes, sale of the lands was expressly prohibited, and, of course, the legislature could take no action prohibited by this section, but it was held in *Dantzler Lumber Co.* v. *State,* 97 Miss. 355, 53 So. 1, that the word "land" did not embrace the timber growing thereon, although by statute, and construction of the word "land" by this court, growing timber was part of the realty. The word "land" was given a particularly restricted meaning in that case, as embracing only the soil itself. That decision has been followed in numerous other decisions, and is the settled law of this state. It has enabled the utilization of the state's great asset of wealth, growing timber, for the benefit of the schools of the state.

If we could uphold the contract, that might be the means of bringing to the state great wealth, and still do no great, material harm, as all the risk and expense incident to the boring for oil were contracted to be borne by the appellant. It is hoped that the legislature will enact laws permitting proper contracts to meet the situation.