SMITH *et al. v.* McCULLEN, STATE LAND COM'R, *et al.*

(Division A.   May 3, 1943.)

[13 So. (2d) 319.   No. 35341.]

**J. B. Mayfield,** of Poplarville, for appellants, Township School Trustees.

Greek L. Rice, Attorney-General, by Geo. H. Ethridge, Assistant Attorney-General, for appellants.

42

**Parker & Morse,** of Poplarville, and **R. L. Genin,** of Bay St. Louis, for appellees.

**Green & Green**, of Jackson, and **J. S. Atkinson**, of Shreveport, La., as amici curiae.

52

54

56

64

Argued orally by **Geo. H. Ethridge**, for appellants, by **Robert L. Genin**, for appellees, and by **Garner Green**, as amici curiae.

**McGehee, J.**, delivered the opinion of the court.

The school trustees of Township 3, Range 17, in Pearl River County, and the Attorney General have taken this

appeal from a final decree of the chancery court of said county dismissing the bill of complaint filed by such trustees, as well as the answer and cross-bill of the Attorney General wherein he joins in the prayer of the trustees for the relief prayed for, against the other defendants, to wit, the board of supervisors, the county superintendent of education, and certain other persons, including Guy McCullen, State Land Commissioner, who is a mere nominal defendant having no interest in the subject matter of the suit, and by which proceeding it is sought to have the chancery court render a decree approving a certain proposed, but unexecuted, mineral lease in favor of the Sun Oil Company for the exploration and possible production of oil, gas and other minerals on Section 16 of said township and to direct the execution of the same by said trustees, or, in the alternative, by such other person or persons as may be designated by the court on behalf of the inhabitants of the township and for the benefit of the educable children therein, upon the theory that under Chapter 150, Laws of 1942, amending Section 6762, Code of 1930, no one else is now vested with authority to lease a sixteenth section of land for mineral purposes in the territory lying south of the 31 degree of north latitude, embracing Pearl River, Hancock, Harrison, Jackson, George, Stone, and parts of Forrest and Perry Counties, and also in substantial portions of Lowndes, Clay, and Monroe Counties in the eastern part of the state, and the counties of Warren, Claiborne, Jefferson, Adams, Wilkinson, and the larger portions of Amite and Franklin Counties in the southwestern part of the state referred to in the record as the ''Old Natchez District,'' and in all of which said three separate territories such lands are likewise held by the state as trustee and reserved for the support of the township schools, it being contended that said Chapter 150, Laws of 1942, has withdrawn from the boards of supervisors in the various counties throughout the state, including the above mentioned areas, which have control over any sixteenth sections of land reserved

for such purposes, or lands held in lieu thereof, the authority which they formerly had under said Section 6762, Code of 1930, to make such a lease with the approval of the Governor and the Attorney General, and has apparently undertaken to vest authority in the boards of supervisors of those counties alone that are situated in a particular area of the state which is referred to in the said Act of 1942 as the "Choctaw purchase," to make such a lease with the approval of the county superintendent of education. And it is alleged that Pearl River County is outside of the Choctaw purchase within the meaning of the statute in question; that, therefore, there is now no statutory power and authority vested in any officer or officers to make such a lease, and that the chancery court in the exercise of its constitutional jurisdiction in all matters in equity under Section 159 of the State Constitution should authorize the proper persons to lease said land for oil and gas in order that the trust under which the state holds title to the same as trustee for the benefit of the township schools may be faithfully administered.

The board of supervisors and the county superintendent of education interposed demurrers and also filed answers to the bill of complaint, wherein they assert their lack of authority under Chapter 150, Laws of 1942, supra, to execute a lease on any sixteenth sections of land in their county, admit the fairness of the proposed lease to the Sun Oil Company and that it would be advantageous to the inhabitants of the township for the same to be executed, but deny the authority of the complainants to bring this suit, and challenge the jurisdiction of the chancery court to grant the relief prayed for, the substance for which last mentioned objection, as we understand it, being (1) that the duty of the state as trustee to provide for the leasing of these lands is not such a trust as is contemplated within the equity powers conferred upon said court by Section 159 of the Constitution, nor is the state such a trustee as may be required by its courts to perform its functions through any agency designated by decree in

that behalf in the absence of its own consent given by legislative enactment; and (2) that an adequate, full and complete remedy is provided by law for the leaving of said lands for mineral purposes by the board of supervisors with the approval of the Governor and the Attorney General under Section 6762, Code of 1930, supra, on the assumption that the said Act of 1942, amendatory thereof, is unconstitutional, and therefore ineffective to modify or repeal the authority granted to said officials under the code section, supra, for the alleged reason that the amendatory act is a special or local law, in contravention of Section 90, subsection (p) of the State Constitution, in that it denies benefits to the educable children in various counties of the state which by its terms and provisions are vouchsafed to the educable children in other sections thereof, without any reasonable basis for such classification and discrimination.

The court below was of the opinion that in the exercise of its equity powers under Section 159 of the Constitution, it would have jurisdiction to grant the relief prayed for in the absence of any legislative authority vested in anyone else in that behalf, but held that said Chapter 150, Laws of 1942, is unconstitutional for the reason hereinbefore mentioned, and that therefore such lease could be made under the statute sought to be amended by said act. The court, therefore, sustained the demurrers to the bill of complaint and cross-bill after hearing proof both as to the fairness of the proposed lease and as to whether from a historical standpoint the use of the words ''in the Choctaw purchase,'' as contained in the act, had the effect of limiting the application thereof to a particular area of the state such as would exclude the land here involved, and a decree was then rendered dismissing said pleadings when the complainants declined to plead further.

From the foregoing statement of the case it will be seen that there was presented to the court below the question of whether or not the sixteenth section of land

here involved is subject to lease at all under the present state of our legislative enactments on the subject or under the authority of a decree of the chancery court. Section 6773, Code of 1930, provides that "The chancery courts have jurisdiction to determine, on bill or petition, what lands are, or may be, subject to lease under provisions of this article; but all sixteenth sections, or lands taken in lieu thereof, are presumed to be so subject, unless the contrary be shown clearly." Hence, it follows that said court was confronted with the necessity of deciding whether or not the right previously conferred upon board of supervisors to make such a lease with the approval of the Governor and the Attorney General under Section 6762 of said Code had been effectually withdrawn, and this question was to be determined (1) upon the construction and application given to the amendatory act, Chapter 150, Laws of 1942, supra, that is to say, whether the authority to make leases thereunder was limited to a particular area of the state which in a true historical sense might exclude the right to do so in Pearl River County, and (2), if so, whether said Act of 1942 is unconstitutional as a special or local law in alleged violation of Section 90, subsection (p) of the State Constitution, as contended by the board of supervisors. On the second proposition above stated, it is the contention of the appellants that said amendatory act should be so construed and applied as to exclude said county from its operation, and that the same should, nevertheless, be held constitutional, thereby leaving the chancery court vested with full authority under its equity powers to lease lands for mineral purposes in the excluded area, and with the result that we would have a situation where the sixteenth sections of land reserved for school purposes, and lands held in lieu thereof, would be leased for mineral purposes in a large area of the state by the boards of supervisors upon the approval of the county superintendent of education, that is to say, pursuant to legislative fiat as contemplated by Section 211 of the State Constitution that

all of such lands should be, if leased at all, and the remainder of them leased by decree of court alone; and this condition of divided authority would likewise prevail to such an extent that even in the same county the board of supervisors and the county superintendent of education would lease a part of the lands and the chancery court the other, that is to say, in Lowndes, Clay, Monroe, Amite, Franklin, Forrest and Perry which are located partly within and partly without the so-called restricted area.

In further reference to the alleged jurisdiction of the chancery court in the premises, we have already noted that the proposed lease, made an exhibit to the bill of complaint, is unexecuted. Therefore, equity jurisdiction cannot be sustained under Section 6775, Code of 1930, conferring upon the chancery court the authority to confirm "a lease heretofore made by the board of supervisors or by their authority or direction"; that, hence, the only statutory power vested in such court to entertain the present suit is Section 6773, Code of 1930, hereinbefore quoted, giving it jurisdiction to determine whether the land here involved is subject to lease by the proper authorities under any existing law whether due to the claim of an existing lease thereon or other legal obstacle. For that purpose, we are of the opinion that the court had jurisdiction and that the chancellor was confronted with the necessity of passing upon the constitutionality of said amendatory act of 1942, to the end that he might adjudicate the question of whether the lands could be leased by the board of supervisors with the approval of the Governor and the Attorney General under Section 6762, Code of 1930, supra, upon the theory that the act amendatory thereof should be held unconstitutional as a special or local law creating an unwarranted classification as between counties having control over such lands reserved for school purposes, as contended by the board of supervisors, or were not subject to lease at all, either under the said code section or the said act of 1942, ex-

cept by decree of the court upon the theory and contention of the appellants that said last enactment had validly withdrawn all statutory authority from any officer or officers so to do in the county where the land covered by the proposed lease is located. But we are of the further opinion that the statute granting authority to determine whether or not any sixteenth section of land, or land held in lieu thereof, is subject to lease does not vest the power in the chancery court to make the lease here involved, since Section 211 of the Constitution provides that the legislature shall enact such laws as may be necessary in the premises, and this law-making body in the exercise of its constitutional prerogative has enacted laws whereby the counties, through their respective boards of supervisors, etc., have been given jurisdiction and control in such matters by virtue of Article 27 on "Sixteenth Sections and Lieu Lands" of Chapter 163 on Schools, Code of 1930; and it is provided by Section 6762 of said Code, as well as by the act amendatory therof, that the board of supervisors, with the approval of the other officials therein named, are authorized and empowered, in their discretion, to make such leases upon such terms and for such consideration as the board of supervisors, in its discretion, shall deem advisable and proper, but within certain prescribed limitations so far as the amendatory act is concerned. In other words, under the conclusion reached by us in the case at bar as to the proper construction and application of the act in question, there has been no failure of the legislature to enact necessary laws to carry out the mandate of Section 211 of the Constitution, and even if it could be assumed that the chancery court in the exercise of its equity powers under Section 159 thereof would be entitled to grant the relief prayed for in the absence of authority on the part of anyone else to make such a lease for the benefit of the educable children of the township—a case not now before us—it could not direct or control by its decree the execution of the lease herein by those officials who are

vested with a discretion and charged with the responsibility under the law of determining whether or not, and upon what terms and for what consideration, a lease should be executed in a given case.

Where under a constitutional mandate a thing is to be done pursuant to subsequent legislative enactment, and the legislature has thereafter enacted the necessary laws in that behalf, conferring jurisdiction and control of the subject matter upon a particular board or tribunal, it will not be presumed that the framers of the Constitution intended that the duty or power to do the thing required should be performed by some other body or tribunal under its granted or inherent powers which do not deal with such subject matter, either expressly or by necessary implication.

These views bring us to a consideration of the question of whether the court below had jurisdiction to determine and adjudicate the issue whether or not the sixteenth section of land here involved is subject to lease under the existing statutes, as well as the right of the Attorney General to invoke its jurisdiction in that behalf by means of his cross-bill in view of the public interest involved in the contention of the county superintendent of education that no one has authority to make such a lease, the contention of the board of supervisors that it has the right to do so with the approval of the Governor and the Attorney General under Section 6762, Code of 1930, and the contention of the said cross-complainant that the chancery court alone has jurisdiction to grant relief. And the jurisdiction to determine these questions is not dependent upon whether the township school trustees had the right to file the original bill of complaint under the facts of the particular case. In order to determine the court's jurisdiction for the purpose above mentioned under Section 6773, supra, and the extent to which it may grant relief, we necessarily reach the constitutional question presented by the respective parties as to the construction and application of said Chapter 150, Laws of 1942, even

though we affirm the decree of the court below in holding that it was without jurisdiction to grant any of the relief prayed for in so far as approving the proposed lease and directing the execution thereof is concerned. We arrive at our decision under a different view to those urged by the several litigants, respectively, and of which we have already taken cognizance herein in regard to the effect of the amendatory act in question, as well as the view of the court below, and base our conclusion largely upon the considerations argued by counsel amicus curiae who has briefed the issues on behalf of others interested in the construction to be given to the statutes involved.

Section 6762, Code of 1930, supra, reads as follows: "The boards of supervisors upon approval of the governor and attorney-general are hereby authorized and empowered, in their discretion, to lease sixteenth section lands in their respective counties, or the lands held in lieu of same, reserved for the support of township schools, for oil, gas, and mineral exploration and development, upon such terms and conditions and for such consideration as the board of supervisors, in its discretion, shall deem proper and advisable."

Chapter 150, Laws of 1942, supra, provides that said Section 6762, Code of 1930, "be and the same is hereby amended to read as follows: . . . The boards of supervisors upon approval of the county superintendent of education of each county are hereby authorized and empowered, in their discretion, to lease sixteenth section lands in their respective counties, where such land was included in the Choctaw purchase, or the lands held in lieu of same whether located therein or elsewhere, reserved for the support of township schools, for oil, gas and mineral exploration and development upon such terms and conditions, and for such consideration as the boards of supervisors, in their discretion, shall deem proper and advisable . . . "

The title of the foregoing amendatory act indicates no purpose on the part of the legislature to limit the appli-

cation of the law, as amended, to lands "in the Choctaw purchase," whatever that term is intended to imply. It purports to authorize the boards of supervisors of "the various counties of Mississippi" to execute mineral leases on sixteenth section school lands or lands held in lieu thereof "in their respective counties." The only limitation therein on the right to lease the lands of the description above stated is that they shall be "school lands" —a class that would include all sixteenth section lands or lands held in lieu thereof in any county of the state where such land is located outside of the Chickasaw Cession, the sixteenth sections and all other lands in that Cession having been sold by the United States and the proceeds of such sales paid over to the Chickasaw Indians under the terms of its treaty with them, October 20 and 22, 1832, ratified March 1, 1833. 7 Peters' Comp. 381, 388, set forth in Hutchinson's Mississippi Code, Chapter 5, pp. 128-135. This Chickasaw Cession is said to have embraced, an area of 6,283,804 acres in the northern and northeastern parts of the state, and since the United States had agreed to turn over to these Indians the net proceeds of the sales, without any provisions having been made for the reservation of the sixteenth section in each township for the support of the common schools, as had been done elsewhere in this state, the condition of inequality was remedied later by Congress granting in lieu of such reservation, one thirty-sixth part of the ceded lands, and which lands so thus granted on July 4, 1836, U. S. Stat., vol. 5, p. 116, Chapter CCCLV, as amended by the statute of June 13, 1842, U. S. Stat., vol. 5, p. 490, Chapter XL, were later offered for sale, pursuant to Article 38, Act of February 23, 1848, Hutchinson's Mississippi Code, 233, "at public auction, to the highest bidder, for lease for the term of ninety-nine years, and renewable to the lessee, his heirs or assigns, forever . . . ''

The said Chapter 150, Laws of 1942, was adopted as House Bill No. 688, and, as disclosed by the House

Journal, the provisions of the act as reported to the House conformed to the purport of its title and authorized the boards of supervisors upon the approval of the county superintendent of education "to lease sixteenth section lands in their respective counties, or lands held in lieu of same whether (the lands held in lieu thereof were) located therein (in their respective counties) or elsewhere," the lands held in lieu being mostly located in about two counties in the extreme southern part of the state. It was amended on the floor of the House by inserting the words "where such land (in sixteenth sections) was included in the Choctaw purchase," the amendment having been offered by a representative from Itawamba County located in the Chickasaw Cession; and manifestly was offered and adopted for the purpose of distinguishing the lands proposed to be leased from the sixteenth section lands located in the Chickasaw Cession where the author of the amendment resided, the title to which lands had been virtually converted into a fee-simple ownership in those in possession by virtue of the right of perpetual renewal of the leases, and also under Chapter 217, Laws of 1854, making it the duty of the treasurer thereafter to give to the purchaser of such a lease a certificate of payment upon the production of which it became the duty of the governor to issue a patent, and which act also provided that "all lands heretofore leased . . . shall be renewable to the lessee, . . . forever, without the payment . . . of any other sum . . . than may be necessary as charges (in connection with the issuance of patents or other evidence of purchases of such perpetually renewable leases) by the proper officers of the State." The foregoing view as to the purpose of the amendment is further supported by the fact that it was adopted by a practically unanimous vote of the house and concurred in by the unanimous vote of the Senate, including the votes of the representatives and senators residing in those counties comprising the three separate areas, hereinbefore mentioned, in the southern, eastern, and

southwestern portions of the state and now claimed to have been excluded from the operation of the act. Moreover, the only lands which had ever been reserved for the support of the township schools were those in the Chickasaw Cession, which had already been virtually sold outright as aforesaid, and the proceeds converted into the "Chickasaw School Fund," and which were not necessarily sixteenth sections, and those school lands located outside of said Chickasaw Cession; and the presumption is that the members of the legislature did not intend to exclude from the beneficent results of the act the educable children in those particular sections of the state hereinbefore mentioned as being outside of the Choctaw purchase and at the same time include within the operation of the said act only those counties now claimed to be within the Choctaw purchase, in a literal sense, when viewed from an historical standpoint. Then, too, Section 211 of the Mississippi Constitution of 1890 requires, in effect, that the legislature shall enact such laws as may be necessary to obtain revenues from the sixteenth section lands, or lands granted in lieu thereof, reserved for the support of the township schools, by leasing the same under certain limitations therein prescribed; and Section 6773 of the Code of 1930, which has not been amended, recognizes the jurisdiction of the chancery court to determine what lands are, or may be, subject to lease, and declares that "all sixteenth sections, or lands taken in lieu thereof [and reserved for school purposes] are presumed to be so subject, unless the contrary be shown clearly."

Section 211 of the Constitution, supra, provides as follows: "The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, or land granted in lieu thereof, in the Choctaw purchase, and shall provide that the sixteenth section lands reserved for the support of township schools shall not be sold, nor shall they be leased for a langer term than ten years for a gross sum; but the legislature may provide for the lease of any

of said lands for a term not exceeding twenty-five years for a ground rental, payable annually; and, in case of uncleared lands, may lease them for such short term as may be deemed proper in consideration of the improvement thereof, with right thereafter to lease for a term or to hold on payment of ground rent.''

Two views are suggested as to the proper construction to be given the words ''in the Choctaw purchase'' appearing in the foregoing constitutional provision: (1) That such provision had a twofold purpose, (a) to require that ''the true condition of the title'' of the sixteenth section lands, or land granted in lieu thereof, in the Choctaw purchase, should be ascertained, limiting the application of the words to the land acquired from the Choctaw Indians under the treaties hereinafter mentioned, and (b) that none of the sixteenth section lands reserved for the support of the township schools should be sold, but should be leased under the limitations therein set forth; but that neither of such requirements were intended to apply to the sixteenth sections in the Chickasaw Cession, since neither they, nor any other lands located therein, were being reserved for such purposes at the time of the adoption of said Constitution, and the one thirty-sixth part of the lands of said Cession, wherever they were located therein, had practically all been leased under such circumstances as to virtually amount to a fee-simple title, and any remaining acres therein were then subject to be so leased; and (2) that the use of the words ''in the Choctaw purchase'' was intended to qualify all of the provisions of this constitutional mandate, but that they were used merely to distinguish the lands to be leased, as well as those the ''true condition of the title'' to which was to be ascertained, from the lands in the Chickasaw Cession as to which all confusion as to title had been removed and the right of the state as trustee of the title surrendered so far as making the short-term leases contemplated by Section 211 was concerned by virtue of the Act of Congress of July 4, 1836, Article 38, Act of Feb-

ruary 23, 1848, Hutchinson's Miss. Code, 233, etc., here-inbefore cited, and Chapter 217, Laws of 1854, heretofore quoted from; that the lands covered by said Section 211 of the Constitution included all sixteenth sections of land, and lands held in lieu thereof, reserved for the support of the township schools in the counties and parts of counties south of the 31 degree of north latitude as aforesaid, all those in Lowndes, Clay, and Monroe counties, and those in the old ''Natchez District,'' the same as elsewhere outside of the Chickasaw Cession.

In support of the first theory of construction above stated, the appellants, the board of supervisors and the county superintendent of education, rely upon an historical map prepared by the late Director of the Department of Archives and History, Dr. Dunbar Rowland, and introduced in evidence, which purports to show that from an historical standpoint the Choctaw purchase is comprised of such lands only as were included in the treaties between the United States and the Choctaw nation, at Mount Dexter, November 16, 1805—Laws U. S. Ed. 1815, I, 349; Land Laws 1828 . . . 127; 7 U. S. Stat. 98; at Doak's Stand, October 18, 1820—ratified January 8, 1821 —Acts 1821 . . . 95; 7 U. S. Stat. 215, 216; and at Dancing Rabbit Creek, September 27, 28, 1830—ratified February 24, 1831—7 U. S. Stat. 333, Hutchinson's Miss. Code, Chap. 5, pp. 119-128, and which said last above mentioned treaty ceded ''the entire country they (the Choctaw nation of Indians) own and possess east of the Mississippi River,'' and which map excludes the lands below the said 31 degree of north latitude, parts of the counties of Lowndes, Clay, and Monroe and the territory in the old Natchez District, as aforesaid, as well as the Chickasaw Cession.

In support of the second theory of construction above stated, counsel amicus curiae refer to the proceedings of the Constitutional Convention, showing that Judge Edward Mayes, a delegate from the state at large, introduced a provision, or resolution, out of which said Section 211

was finally evolved, making it the duty of the Attorney General to prepare for the next legislature a bill "to secure proper legislation looking to the recovery of squandered school land, etc., commonly known as the 'Sixteenth Section', etc." Journal, p. 98. And it is contended that whatever practice had been engaged in by local authorities and lessees in connection with the ninety-nine year leases theretofore executed in the counties located in the Choctaw purchase, as delineated on the map hereinbefore referred to, had likewise prevailed in the area excluded therefrom on this map and not located in the Chickasaw Cession; that we cannot ascribe to the framers of this provision of the Constitution a purpose to rectify partially and leave unrectified precisely the same evil in adjoining territory wherein rectification was equally requisite; and that any confusion of title did not arise because of the source from which these lands had been originally acquired by the government, but rather due to the practices under which the leases had been obtained to such lands as the state was then still holding the title as trustee for the support of the schools, as distinguished from the Chickasaw lands already converted into the "Chickasaw School Fund."

The proceedings of this Convention disclose that the proposal of Judge Mayes was submitted to the Committee on Education, and was later reported so as to contain, among other recitals, a condition to the effect that "the lands reserved by the acts of Congress, passed 4th July, 1836 and 13th June, 1842, are not included in this provision." This refers definitely to the one thirty-sixth part of the lands set apart for school purposes out of the Chickasaw Cession as heretofore shown, U. S. Stat., vol. 5, p. 116, chapter CCCLV.

Thereafter, Mr. Yerger proposed that "the legislature shall enact such laws as may be necessary to ascertain the true condition of the title of the sixteenth section lands in this state, or land granted in lieu thereof," etc. Since there were sixteenth sections of land in the Chick-

asaw Cession, Mr. Dillard offered to amend by inserting after the lands referred to the words "reserved for the support of the township schools." This amendment was accepted and would have clarified the provision except for the fact that one thirty-sixth part of the lands in the Chickasaw Cession had in fact been reserved originally for such purpose by the acts of Congress relating to the Chickasaw lands passed "4th July, 1836, and 13th June, 1842," but they had been thereafter leased under Chapter 217, Laws of 1854, in such manner as to virtually convert the leaseholds into fee-simple titles as hereinbefore stated; and thereupon it was evidently thought necessary by Mr. Jamison, a farmer from Noxubee County, residing outside of the Chickasaw Cession, that in order to make it clear that the lands in the Chickasaw Cession were not to be dealt with under the powers either granted or being denied by the proposed constitutional provision, providing for short-term leases, it should be further amended so as to insert after the words "sixteenth section lands in this state, or lands granted in lieu thereof," the words "in the Choctaw purchase." This amendment was accepted and inserted in the proposed Section 211, and it is contended that if the words "in the Choctaw purchase" be held not to apply to all such school lands as are outside of the Chickasaw Cession, then Judge Edward Mayes, Yerger, and Dillard, who were apparently steering this constitutional provision through the Convention, are placed in the attitude of having agreed, without protest, to its emasculation (after having made express reference to the Acts of Congress, July 4, 1836 and June 13, 1842, as aforesaid, in their original undertaking), and of having consented that the state, outside of the Chickasaw Cession, should be severed and divided into portions, one wherein the legislature was mandatorily required to rectify, the other wherein the wrong of precisely the same degree was to be continued to run rampant.

Pursuant to Section 211 of the Constitution, the legislature, in 1892, adopted the provisions of the code pre-

pared by Messrs. Thompson, Dillard, and Campbell, who were outstanding members of the Constitutional Convention of 1890, and it was required by Sections 4144-4147 thereof, respectively, that "the board of supervisors of each county wherein is situated a sixteenth section of land, . . . or another section . . . taken in lieu of any sixteenth section . . . reserved for the support of township schools . . . shall take all such further action as shall be necessary to ascertain the true condition of the title to each parcel of such land in its county, and to establish and confirm the same, . . ."; that abstracts of title should be made therefor; that funds derived from the leases thereof should be discovered and properly applied; and that suits should be filed to establish the titles and settle disputes whenever necessary. These statutes were brought forward in the succeeding codes and have been generally understood to have reference to all lands reserved for the support of the township schools outside of the Chickasaw Cession, that is to say, all of the school lands over which the boards of supervisors were given control, wherever situated. Moreover, the words "in the Choctaw purchase" have not been used in any statute since the adoption of the Constitution of 1890 until the enactment of Chapter 150, Laws of 1942, supra, but all of the statutes in the chapters on "sixteenth Sections," contained in the Code of 1892, 1906, and 1930, have dealt with the sixteenth sections or lands held in lieu thereof, and reserved for school purposes, outside of the Chickasaw Cession, as being in one and the same class. It is therefore urged by counsel, amicus curiae, that the contemporaneous construction given Section 211 of the Constitution by the code commissioners and legislature of 1892, and the subsequent legislative history of dealing with all school lands outside of the Chickasaw Cession in the same manner, would justify a construction being given to both the constitutional provision and to the said act of 1942, such as would give the words "in the Choctaw purchase" a state-wide application outside of the Chickasaw Cession.

In further support of this view it will be noted from Section 211 of the Constitution that the words "sixteenth section lands in this state" and the words or "granted in lieu thereof" all appear immediately before the words "in the Choctaw purchase," and yet we find that two years thereafter the said code commissioners procured the adoption of Section 4160 of the Revised Code of 1892, which provides, among other things, that the 30,829.16 acres of land in Hancock County received in lieu of sixteenth sections "shall be dealt with in all respects as other sixteenth section lands notwithstanding their location outside of the counties interested." Practically all of the lands held in lieu of sixteenth section lands were located in Hancock County, outside of what is claimed to be the Choctaw purchase; and this fact would indicate that the makers of the Constitution were dealing with the land granted in lieu of sixteenth sections as being in the Choctaw purchase, although located for the most part below the 31st degree of north latitude.

Then, too, Dr. Dunbar Rowland, who prepared the map heretofore referred to and introduced in evidence, stated, in vol. 1, p. 64, of "Mississippi, the Heart of the South"; "Speaking in general terms of the Muskhogean, or Choctaw-Muskhogen family, it may be said to have occupied for many centuries prior to the coming of the white races all that vast area of country extending from the Savannah River and the Atlantic west to the Mississippi River, and from the Gulf of Mexico north to the Tennessee River, with the exception of certain small areas in the possession of the Yuchi, Natchez and some settlements of Shawni."

Also it will be found that this court, in the case of Montgomery et al. v. Doe ex dem. Ives et al., 13 Smedes & M. 161, speaking through Judge Clayton, said: "By the treaty of peace concluded between Great Britain and the United States, in 1783, at the end of the war of the revolution, Great Britain acknowledged the southern boundary of the United States to be the thirty-first degree

of north latitude. The boundaries were particularly described. By a treaty made between Great Britain and Spain, about the same time, the Floridas were ceded to Spain, without any description of boundary.'' The court further said: ''After the war of 1756, by the treaty concluded in 1763, Spain ceded to Great Britain, Florida, Fort St. Augustin, the Bay of Pensacola, and all that she possessed on·the continent of North America, to the east or southeast of the river Mississippi. At the same time, France also ceded to Great Britain the whole of New France, and all of that portion of the province of Louisiana, lying upon the east side of the Mississippi river, except the island of New Orleans. Great Britain, by these concessions, became the owner, subject to the Indian right of occupancy of all the land between the Mississippi river, and the Atlantic Ocean.''

Therefore, the question arises as to what is meant by the words ''subject to the Indian right of occupancy of all the land between the Mississippi river, and the Atlantic Ocean,'' since in the year 1763 the Natchez Indians had been exterminated thirty years previously and the land involved in that case was located in Jefferson County in the old Natchez district outside of what is claimed to be the Choctaw purchase, and in regard to which the court further said: ''The Indian title to the country in which this tract of land lies, was not then extinguished [on the 7th of October, 1763]. In point of fact, it was not extinguished until May, 1777, when the Choctaws relinquished their title to it, by a treaty at Mobile with the British superintendent of Indian affairs. . . . The country embraced in the relinquishment extended from the mouth of the Yazoo, down the Mississippi, till it intersects the 31st degree of north latitude, and reached in the interior at the beginning, some fifteen, and at the lower end some sixty miles'' This area would apparently coincide with the boundaries of the old Natchez district. Elsewhere in its opinion the court said that ''In the war between the French and the Natchez tribe of Indians,

which terminated about the year, 1730, in the extinction of that tribe, the Choctaws were the allies of the French, and gave them very efficient aid. It is probable from the fact of the treaty made by the British with them at Mobile, in 1777, before mentioned, that they succeeded to and occupied the hunting grounds of the Natchez, in virtue of the conquest. . . . 1 Martin's Hist. Louisiana, 280-287; 1 Monette, 274.''

Thus, it would appear that if the Natchez tribe of Indians were extinguished in 1730, they were non-existent in 1763 when Spain and France made the concessions to Great Britain and when she ''became the owner, subject to the Indian right of occupancy,'' as aforesaid, and that this tribe had been exterminated for a period of approximately seventy-five years before the treaty was made between the United States and the Choctaw nation of Indians, at Mount Dexter, November 16, 1805, and for approximately ninety years before the treaty at Doak's Stand, October 18, 1820, and for approximately one hundred years when the treaty was made at Dancing Rabbit Creek, September 27, and 28, 1830, and for a like period when the treaty was made with the Chickasaw Indians, at Pontotoc Creek, October 20 and 22, 1832, 7 U. S. Stat., pp. 381 and 388, hereinbefore mentioned. The Biloxi, Pascagoula and other minor tribes had then also become long since extinct; and hence at the time of these treaties the United States had need to extinguish only the Choctaw and Chickasaw titles, and that consequently the framers of the Constitution of 1890 were concerned only with the Choctaw and Chickasaw lands when adopting the said Section 211 of that Constitution. At any rate, there had never been any other school lands with which they were called upon to deal, and there was naught to be done in reference to the Chickasaw lands insofar as ascertaining the true condition of the title thereto or of leasing the same for a short period of years.

As against the foregoing alleged historical truths, it is contended by counsel for the appellee board of super-

visors that ''The fact is that all that section below the thirty-first parallel was claimed by the French and by the Spaniards, and we recognized their right by the purchase of the Louisiana territory from France. The United States acquired the French claim to what was known as West Florida in the treaty with the French in 1803 [8 Stat. 200]. By Act of Congress May 14, 1812 [2 Stat. 734], there was added to the Mississippi territory all that land which now lies between the Alabama line and Pearl River and south of the thirty-first parallel.'' It is also contended by some of the appellants that the Choctaws never, at any time, claimed or occupied any lands outside of those expressly covered by the treaties heretofore referred to, and delineated on the map as being in the Choctaw purchase, even though the ''Dancing Rabbit Treaty'' did purport to cede ''The entire country they own and possess east of the Mississippi river.''

However, it is unnecessary that we decide whether or not from a true historical standpoint the Choctaw Indians ever claimed or possessed any land in said extreme southern part of the state, or in Lowndes, Clay, and Monroe Counties, or in the old Natchez district, since the only question before us is that of determining in what sense the words ''in the Choctaw purchase'' were used in Section 211 of the Constitution and in the Act of 1942, here involved; and we have reached the conclusion that the use of such words was intended only to distinguish the lands referred to from those in the Chickasaw Cession.

We, therefore, affirm the decree of the court below in dismissing the bill of complaint and the cross-bill, but we hold, contrary to the view of the court below, that said Chapter 150, Laws of 1942, supra, is constitutional, and that the land involved in this suit is subject to lease for mineral purposes by the board of supervisors of the county upon the approval of the county superintendent of education under said act.

Affirmed.