578 So.2d 644 (1991)
CHEVRON U.S.A., INC., et al.,
v.
STATE of Mississippi, et al.
No. 07-CA-58036.
Supreme Court of Mississippi.
April 3, 1991.
*645 Martha W. Gerald, Walker L. Watters, Gerald & Brand, Jackson, C. Denton Gibbes Jr., Gibbes Graves Mullins Bullock & Ferris, Laurel, for appellant.
Edwin Lloyd Pittman, Atty. Gen., elected Supreme Court Justice January 3, 1989; Mike C. Moore, Atty. Gen., W.O. Dillard, Robert E. Sanders, Asst. Attys. Gen., Jackson, Terry L. Caves, Leonard B. Caves, Caves & Caves, Laurel, for appellee.
Otis Johnson, Jr., Heidelberg & Woodliff, Jackson, for amicus curiae.
En Banc.

ON PETITION FOR REHEARING
SULLIVAN, Justice, for the Court:
On Petition for Rehearing the original opinions are withdrawn and these opinions substituted therefor.
Chevron U.S.A., Inc., et al, have appealed from a decree of the Chancery Court of the Second Judicial District of Jones County finding Chevron had no right under a 1957 oil and gas lease to explore, over 25 years later, for oil and gas in other areas and horizons of the leased property than the producing reservoir on the sixteenth section land under the lease. The State and county school board have cross-appealed, contending that the entire oil and gas lease was ineffective and void after 25 years from the date of execution, under § 211 of our Constitution.

FACTS
In January, 1957, the Board of Supervisors of Jones County advertised for bids to lease Section 16, Township 9 North, Range 11 West for oil, gas and mineral development. After compliance with Section 6600, Code 1942, the Board, with the approval of the County Superintendent of Education, *646 executed an oil and gas lease to W.H. Potts on February 4, 1957. The county received a bonus of slightly more than $22,500 for executing the lease.
Potts assigned the lease to the predecessor corporation of Chevron U.S.A., which in turn assigned a portion of its interest to other parties, all hereinafter designated as "Chevron."
In accordance with the terms of the lease and Section 6600 of the 1942 Mississippi Code, annual delay rentals of $643.00 were paid to the Jones County Superintendent of Education for the years 1958, 1959 and 1960. On or about December 12, 1960, Chevron commenced drilling the Board of Supervisors No. 2, Well No. 1 (2-1 Well) on the NW 1/4 of Section 16. The Board of Supervisors 2-1 Well was completed in February, 1961, as a producing oil well. Since the completion of the Board of Supervisors 2-1 Well, Chevron, or its co-owners, have drilled eight other wells on the leasehold, including one "dry hole." There has been continuous operation or production from at least one of the wells on the property since the completion of the 2-1 Well. Cumulative production from the eight producing wells on the property approximated 1.5 million barrels of oil and 400,000 million cubic feet (mcf) of gas at the time of the trial, and there were seven producing oil wells on this section.
Miss. Code Ann. § 11-17-29 (1972), authorizes suits in chancery court to confirm and quiet title. Miss. Code Ann. § 29-3-103 (Supp. 1984), authorizes lessees to confirm and quiet sixteenth section leases, or extensions thereof, naming the superintendent of education of the district where the lease is created as defendant. Under the authority of these sections, Chevron, on July 30, 1984, filed a bill of complaint in the Chancery Court of the Second Judicial District of Jones County to confirm and quiet the interest conveyed to Potts under the 1957 oil and gas lease, and naming the State of Mississippi and the Jones County Superintendent of Education as defendants.
In response to this action, the defendants answered and counter-claimed, pleading that the lease, under the provisions of § 211 of the Mississippi Constitution, expired on February 4, 1982, and asked for an accounting.
At trial in February, 1985, Chevron offered evidence that their development had been prudent, and that their manner of extraction was best suited for obtaining a maximum recovery of the oil and gas reserves from the discovered reservoir. They also presented evidence of their plan, if their leasehold interest should be confirmed, to drill new, deeper wells to another formation several thousand feet lower than the 12,000 feet reservoir supplying the producing wells. These were called the "Smackover" and "Lower Cotton Valley" formations.
In a well-reasoned and thoroughly-researched opinion, the chancellor recited the history and developments of the law as pertaining to leases of sixteenth section lands. He held that the 25-year limitation of § 211 of our Constitution had no application to an oil or gas lease.
He confirmed Chevron's right to continue its operations to extract oil and gas from the producing reservoir. He held that, "[S]uch an interpretation provides for the orderly development of oil, gas and mineral leases which development inures directly to the benefit of the schools of the state." He also held that the state was estopped from contesting the validity of the lease as to Chevron's right to continue its operations to recover the maximum amount of oil and gas from the producing reservoir. Finally, he held that Chevron could not retain indefinitely all undeveloped areas of the lease and thereby cancelled the oil, gas and mineral lease as to all non-producing areas and horizons.
From this judgment, Chevron has appealed the chancellor's cancellation of the lease as to all non-producing horizons and areas; the State has cross-appealed, contending that § 211 applies to all leases and did not authorize the extension of the lease beyond 25 years, and that the chancellor erred in holding that § 211 had no application to an oil and gas lease.
In attempting to resolve a conflict between the Constitution and the general *647 practice of oil, gas and mineral leasing, the chancellor resorted to equity. In so doing he has given priority to economic possibilities over constitutional reality. The ruling of the chancery court should be affirmed on appeal and reversed on cross-appeal.

§ 211 OF THE CONSTITUTION OF MISSISSIPPI
The crux of this conflict is positioned between the economic realities of modern oil and gas leasing and the constitutional realities of § 211 of the Mississippi Constitution. At the time that the subject lease was entered on February 4, 1957, Art. 8, § 211 of the Constitution of the State of Mississippi, in pertinent part, provided:
The Legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state .. . and shall provide that the sixteenth section lands reserved for the support of township schools, except as hereinafter provided, shall not be sold nor shall they be leased for a longer term than ten (10) years for lands situated outside municipalities ... for a gross sum; ... but the Legislature may provide for the lease of any said lands for a term not exceeding twenty-five (25) years for a ground rental, payable annually. (Emphasis supplied).
In 1961, § 211 was amended to authorize the Legislature to sell sixteenth section lands for industrial development thereon. Subsequently, in 1986, this section was amended to provide that sixteenth section lands could be leased for a period not to exceed ninety-nine years. The Legislature was also authorized to provide that "forest and agricultural lands" could be leased for a term not exceeding twenty-five years, and "all other classifications of such lands" could be leased for a period not exceeding forty years, for a "ground rental, payable annually."
A review of our jurisprudence indicates that this Court has viewed § 211 as a constitutional limitation on the length of sixteenth section land leases. In Smith v. McCullen, 195 Miss. 34, 80, 13 So.2d 319, 324 (1943), this Court said:
Section 211 of the Mississippi Constitution of 1890 requires, in effect, that the legislature shall enact such laws as may be necessary to obtain revenues from the sixteenth section lands, or lands granted in lieu thereof, reserved for the support of the township schools, by leasing the same under certain limitations therein prescribed. (Emphasis supplied).
In Pace v. State ex rel. Rice, 191 Miss. 780, 800, 4 So.2d 270, 275 (1941), this Court observed:
the previous decisions of this court, holding that the title of the timber on these sixteenth sections of land did not pass to the ninety-nine year lessee (although not reserved by the terms of the lease) should be sufficient authority to sustain the view that the state still owns the minerals to be found beneath the surface.
We continued:
At most the lessee could only be prevented from asserting rights under such a lease after the expiration of the constitutional limitation of twenty-five years.
191 Miss. at 809, 4 So.2d at 279.
Section 211 provides parameters which clearly limit the term of a sixteenth section land lease and indicates that the State is committed to limiting the length of a sixteenth section lease. "[I]t is not for the courts to question the wisdom of any constitutional declaration of public policy by the legislative body." Durham v. Durham, 227 Miss. 76, 84-85, 85 So.2d 807, 809 (1956).

CONSTITUTIONAL REALITIES VS. ECONOMIC REALITIES
The constitutional limitations of § 211 conflict with the established practice in oil, gas and mineral leasing. In the normal scheme of oil and gas leasing, the mineral lessee will negotiate for a primary term. (In the subject lease, this term was for six years.) During the primary term, the lessee has the right to explore and develop the leased land. After the expiration of the primary term, oil, gas and mineral leases commonly provide that the lease shall remain *648 in force as long as oil, gas or minerals are produced or so long as the lessee is engaged in actual drilling operations. Should the production of oil or gas be obtained, this "secondary term" allows the lessee to maintain the lease for as long as economically practical. The economic realities (and the hit and miss nature of oil and gas exploration in general) dictate that to maximize profits, the mineral lessee must be allowed to maintain the lease for an indefinite period of time. This is where the economic realities of oil, gas and mineral leases of sixteenth section land conflict with the constitutional reality of § 211.
In balancing this conflict, the chancellor, in effect, applied § 211 to all non-producing areas but shielded the producing areas from this constitutional limitation. In a very well-written and thoroughly-researched opinion, the chancery court held that:
As to all non-producing areas and horizons, the oil, gas and mineral lease is hereby cancelled and set aside.
As to all existing drills and/or production units as designated by the State Oil & Gas Board and the producing zones included therein, the lease remains in full force and effect so long as the oil, gas and other minerals are produced in accordance with law.
In its judgment, the chancery court confirmed title in favor of Chevron:
as to all areas which have been included in drilling or production units presently designated by the State Oil and Gas Board; and that such lease shall remain in full force and effect according to its terms down to and including the deepest producing zone included therein; Plaintiffs and their assigns shall have all the rights to produce from and operate those areas and horizons as are granted under the terms of the subject lease.
as to all surface facilities, roads or pipelines on the remainder of this Sixteenth Section, which were constructed under the terms of the subject lease, Plaintiffs and their assigns shall have the right to continue to utilize and maintain such facilities under the terms of the subject lease for as long as operations continue on all or any part of the lands set forth in Paragraph 1 above;
The subject Oil, Gas and Mineral Lease is hereby cancelled and set aside as to all areas which are not included in drilling or producing units presently designated by the State Oil & Gas Board and as to all horizons below the deepest producing interval in those areas which have been included in drilling or producing units.
The opinion indicates that the learned chancellor was well aware of the established practice and economic realities of oil, gas and mineral leasing. It is equally obvious that the chancellor used general principles of equity in an effort to cushion the perceived severity of a constitutional and economic collision.
Unfortunately, the charted course avoided conflict only by navigating true to equity and steering clear of the Constitution. By embracing Solomon and ignoring our Constitution, the chancellor committed lese majeste. It is well settled that the Constitution of Mississippi is the supreme law of our state. It "is the highest known law. No act prohibited by it can be given effectuality and validity." McGowan v. State, 184 Miss. 96, 105, 185 So. 826, 829 (1939). See also, Barker v. State, 241 So.2d 355, 358 (Miss. 1970). It is superior to all legislation, to the legislature, to the judiciary, (including chancery courts), and to equity itself. The Constitution's superiority and its vital role in the judicial decision making process is underscored by the oath taken by the judges of the several courts of this state. Art. 6, § 155 of the Mississippi Constitution provides, in part:
I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me ... according to the best of my ability and understanding, agreeably to the Constitution of the United States and the Constitution and laws of the state of Mississippi.
The Mississippi Constitution, like that of the United States, is the supreme law within *649 the range of its authority. It is an expression of the will of people by whom it was passed and by whom it can only be altered. Obviously, as "the highest known law," the Constitution of Mississippi transcends the Solomonic concepts of fairness and equity on which the chancery court's decision was based.
A basic tenet of constitutional law is that only the people of a state are vested with the power of amendment and this power is plenary. This Court, in recognizing this tenet, has stated that the Constitution:
should not be changed, expanded or extended beyond its settled intent and meaning by any court to meet daily changes in the mores, manners, habits, or thinking of the people. The power to alter is the power to erase. Such changes should be made by those authorized so to do by the instrument itself  the people.
State v. Hall, 187 So.2d 861, 863 (Miss. 1966). See 16 C.J.S. Constitutional Law § 5 (1984).
The chancellor's decision was tantamount to a constitutional amendment devoid of the people's concurrence. See Newell v. State, 308 So.2d 71, 77 (Miss. 1975); Grantham v. Denke, 359 So.2d 785, 787 (Ala. 1978); 16 C.J.S. Constitutional Law § 3 (1984).
Another basic tenet of constitutional construction is that it is not permissible to disobey, or to construe into nothingness, a provision of a constitution merely because it may appear to work injustice, or lead to harsh or obnoxious consequences or invidious or unmerited discriminations. Even less weight should be attached to the argument that the constitutional construction will result in mere inconvenience. H. Black, Handbook of American Constitutional Law § 64 at 86 (1927); Talbott v. Thomas, 286 Ky. 786, 151 S.W.2d 1 (1941); 16 C.J.S., Constitutional Law § 22 (1984). The force of a constitutional provision should not be rendered ineffectual merely because one disagrees with it. See U.S. v. Indianola Municipal Separate School Dist., 410 F.2d 626 (5th Cir.1969), cert. denied, 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970); 16 C.J.S. Constitutional Law § 3 (1984).
"[E]xpediency has no application in interpreting constitutions, nor does public clamor, majority, desire, or apparent need...." 16 C.J.S. Constitutional Law § 18 at 67 (1984); See, Stepp v. State, 202 Miss. 725, 32 So.2d 447 (1947), suggestion of error overruled, 202 Miss. 725, 33 So.2d 307 (1948); City of Jackson v. Deposit Guaranty Bank & Trust Co., 160 Miss. 752, 133 So. 195 (1931).
The judiciary of this state is subservient to the Mississippi Constitution. Perhaps the most fundamental concept of constitutional superiority is that constitutional rights cannot be created by statutes or rules, nor can they be abolished by executive or judicial action. See Clark v. Board of Education of Little Rock Sch. Dist., 374 F.2d 569, 570 (8th Cir.1967); 16 C.J.S. Constitutional Law §§ 3, 172 (1984).
Constitutional realities dictate that when the subject lease was entered, sixteenth section lands could not be leased for a period to exceed twenty-five years. Constitutional realities also dictate that should this limitation be too onerous a burden, it is ultimately up to the people of Mississippi, not the judiciary, to amend the Constitution to redress the harsh consequences.
It is obvious that Section 211 limits sixteenth section land leases (including mineral leases) to a maximum term of twenty-five years. It is equally clear that the chancellor's remedy took into account the business realities of Section 211 as applied to mineral leases and attempted to redress these perceived hardships with equitable principles. Unfortunately, the judiciary's responsibility is to interpret the law, not institute economic policy. Should these perceived economic hardships of Section 211 be real, the onus is upon the legislature to redress such economic inadequacies. Most importantly, Article 15, § 273 of the Mississippi Constitution provides the exclusive means for amendment. Such power is ultimately reserved to the people.
*650 Finally, § 29-3-63 of the Mississippi Code, which provides the holder of a lease of sixteenth section land with a prior right, exclusive of all other persons, to re-lease or extend an existing lease, certainly diminishes the perceived harsh consequences which might result from the enforcement of § 211 against all oil, gas and mineral leases of sixteenth section land.

HILL V. THOMPSON
The recent case of Hill v. Thompson, 564 So.2d 1 (Miss. 1989), concerned sixteenth section commercial property in downtown Forest, Mississippi. In 1960, the lot was leased for a one-time payment of $7.50 for a ninety-nine year term and had been used for years as a gasoline and service station. Mr. Thompson, who had purchased the leasehold interest at a 1985 foreclosure sale, filed suit for confirmation of his title to a leasehold interest of the Sixteenth Section School Trust land. The chancery court confirmed title in Mr. Thompson. Even though there was full compliance by the lessee with § 211 and the statutes, under the authority of § 95 of the Mississippi Constitution, this Court reversed the judgment of the lower court and voided Mr. Thompson's lease, holding that the consideration given to lease the land was so inadequate as to amount to a donation, in violation of constitutional prohibitions.
In voiding Mr. Thompson's lease for inadequate consideration, the Court upheld the rule of constitutional construction that a constitutional provision should be enforced even though such enforcement leads "to harsh or obnoxious consequences."
Had this Court upheld the chancellor's determination that Chevron's lease may exceed the twenty-five year constitutional limit as to existing drilling and/or production units merely because "[s]uch an interpretation provides for the orderly development of oil, gas and mineral leases," we would be creating an exception to this rule of constitutional construction. The exception would have read: "Constitutional provisions will be enforced by this Court as long as the enforcement imposes no harsh or obnoxious consequences on large oil companies."
Just as this Court found that Mr. Thompson was on constructive notice that the consideration paid by his predecessor in title was grossly inadequate, Chevron was also on notice that its lease expired after twenty-five years. Further, we are without knowledge of whether the consideration paid by Chevron for this lease was sufficient to avoid the ire of § 95.
There can be no doubt that in a clash between economic realities and constitutional realities, the Constitution prevails. As such, the chancellor's decision, while well written and thoroughly researched, which favored the economic realities, is reversed and remanded for a determination and accounting consistent with this opinion.
THE PETITION FOR REHEARING IS GRANTED. THE ORIGINAL OPINIONS IN THIS CASE ARE WITHDRAWN AND THESE OPINIONS ARE SUBSTITUTED THEREFOR.
AFFIRMED ON DIRECT APPEAL. REVERSED ON CROSS-APPEAL. REMANDED FOR A DETERMINATION AND ACCOUNTING CONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., concur.
ROBERTSON and PRATHER, JJ., dissent.
PITTMAN and BANKS, JJ., not participating.
McRAE, J., not participating according to Supreme Court Internal Rules.

ON PETITION FOR REHEARING
ROBERTSON, Justice, dissenting, from denial of petition for rehearing:
A dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the Court to have been betrayed. *651 Charles Evans Hughes, (later) Chief Justice of the United States, The Supreme Court of the United States 67-68 (1928).

I.
Of course the Constitution trumps conventional oil and gas law, and if I thought for a minute we had been wrong when we read the word "lands" in Section 211 of our Constitution to mean "simply the soil itself," Pace v. State ex rel. Rice, 191 Miss. 780, 809, 4 So.2d 270, 278 (1941), I would say so and join the opinion of Justice Sullivan and lose not a minute's sleep at the tales of gloom and doom told by the oil and gas industry. The judicial mind works within the twin peaks of textual integrity and principled interpretation and may read notions of public policy and economic incentive into the Constitution only within these peaks. I see no plausible suggestion why our prior readings have been wrong, and I have looked. Reflection summons much good sense that Pace is right.
Our Constitution makes no specific mention of oil and gas leases of sixteenth section lands. There was no oil and gas production in Mississippi or neighboring states in 1890. It was not even contemplated. Then oil was discovered in Texas. In 1926, following the constitutional mandate that it make laws to prevent waste, the legislature authorized sixteenth section oil and gas leases. Miss. Laws, ch. 318 (1926). From the beginning we have treated oil and gas as the product of the land, as distinguished from "the soil itself." We regarded oil and gas as merchantable trust assets, worthless until discovered, produced and sold. We recognized early that our failure to sell the oil and gas beneath the school lands could only lead to the waste Section 211 was written to avoid. Following Texas property law, and finding no impediment in this state's constitution, Pace accepted that this valuable and salable trust asset could and should be sold while still in the ground, so that the producers, whom we (mis)labeled lessees, acquired title to the oil and gas in place. And all was well for near half a century.
The history of this state's stewardship of school lands trust assets has been a sorry one and is now familiar. The exception has been in oil and gas. By sharp contrast to what was happening with school lands generally, oil and gas "lessees" have generally paid fair market rentals and royalties. Notwithstanding, the State asks that we revisit Pace and particularly Pace's rendering of "lands" as "simply the soil itself." The Chancery Court entered a Solomonic decree satisfying no one. Our original three to two to three decision was, if anything, more problematical. Hence I try my hand.
Justice Blass has covered the statutes, the property concepts, stare decisis, and more.[1] He has given us much solid law. I write separately and largely by way of supplement, and as there are a few (relatively minor) points where I differ.

II.
Our Constitution affords an objective text, and when we read it we must eschew any search for subjective framers' intent. We must read "lands" in the manner that best fits the word in Section 211's overall context. We seek the meaning most coherent in principle with the best justification which may be given for Section 211's language, and which best serves our state today. Burrell v. Mississippi State Commission, 536 So.2d 848, 855 (Miss. 1989) (and cases cited). That interpretation must cohere as well with other law of equal or superior dignity and with which it electro-magnetically interacts. We ask what the words mean, not what the draftsmen meant. Cf. Holmes, Collected Legal Papers 207 (1920). Because rights have become vested and parties have relied to their detriment, that reading must as well regard *652 Section 211's political and interpretive history, the most prominent feature of which is our 1941 decision in Pace. See Collier v. Shell Oil Co., 534 So.2d 1015, 1018-19 (Miss. 1988).
The word "lands" is open-textured. It requires no scholarly awareness to know that it means different things to different people. "Lands" has different legal meanings in different legal contexts. If I convey "all of my lands" to another and say no more, my grantee acquires all natural and man-made improvements and, as well, the subsurface and any oil, gas or other minerals found therein. But if I lease "all of my lands" to Farmer Brown for a term of years, I part only with my rights in the surface and not in the minerals below. I Williams & Meyers, Oil & Gas Law § 218.3 (1989). Pace, following Dantzler Lumber Co. v. State, 97 Miss. 355, 381, 53 So. 1, 2 (1910), reads Section 211's "lands" in this latter sense.
Pace and Dantzler offer much that explains why they were and are right. By way of supplement, the text "lands" first interacts with the terms of the federally-created school lands trust to which Mississippi became subject at statehood. The Supremacy Clause declares the trust superior law. U.S. Const. Art. VI, cl. 2. Implementing that trust, our Constitution provides that the "lands" the state holds in trust "shall not be sold nor shall they be leased for a longer term than ... twenty-five (25) years for a ground rental, payable annually, ... ." Miss. Const. Art. VIII, § 211. Our interpretation must respect the superior federal law which saddles the state with the common law trustee's duty of prudent management. See Hill v. Thompson, 564 So.2d 1, 6-7 (Miss. 1989) (and cases cited therein). The "lease" at issue implements this duty when it devolves upon Chevron the duty of prudent development.[2]
In the case of a statute susceptible of two constructions, neither inherently unreasonable by reference to the words, we must read it so as to uphold it where one possible construction would render it unconstitutional. See, e.g., Robinson v. State, 143 Miss. 247, 256, 108 So. 903, 904 (1926). By analogy, where our constitution is susceptible of two readings, one of which will likely run afoul superior federal law, we must read our constitution so that we may enforce it.
Sensitive acceptance of the state's federally imposed duties under the federally created school lands trust adds, over and above what Pace says, a powerful reason why the state may not, through its constitution or otherwise, restrict its management of trust assets so that the schools enjoy no benefit. Yet this is precisely what we do, if we treat oil and gas as "lands" which may neither be sold nor leased for more than twenty-five years.
There is a related dimension. The constitutionality of a statute is at stake. Miss. Code Ann. § 29-3-99 (Supp. 1990) authorizes the state to grant the rights Chevron holds. We decide today the lease must be stricken, and when we strike the lease, we strike the statute as well. When we do this we ignore injunctions alluded to above and long accepted when our power of judicial review is invoked. Cases too numerous *653 to cite enjoin that, where the constitutionality of a statute is drawn into question, we will ordinarily afford gray areas of the constitution any reasonable construction that will allow the statute to remain. Miller v. State ex rel. Russell, 130 Miss. 564, 585, 94 So. 706, 709 (1922).
There is a corollary principle. By its enactments the legislature has interpreted Section 211 to allow leases of the sort here challenged. This is an interpretation by a coordinate department of government, whose members are sworn to uphold the self-same constitution as are we. See Alexander v. State By And Through Allain, 441 So.2d 1329, 1347 (Miss. 1983); Russell Inv. Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938). It is an interpretation we ought respect, although I would be the last to deny that in the end we are presented a judicial question within the judicial power which only this Court may finally answer.
The point for the moment is that Pace pointed the way to a reasonable reading of Section 211's "lands" which both fits the constitutional language and proceeds from the best justification that may be given for Section 211's existence today. Pace's reading is as available today as in 1941 and will avoid constitutional infirmity in both Chevron's lease and the statute authorizing it.

III.
None of this denies that practice informs interpretation. Law serves best when it respects the realities of the phenomena it seeks to regulate. Within the dimension of fit  a legitimate reading must fit the text being read  practice may aid our search for the best fit.
Dantzler confronted the question whether "lands" included the timber growing on school lands and held that it did not, and it is important that we understand why this is right. If timber be "lands," neither the state nor its managing agents, the school boards, may sell it. The reason this is so is that Section 211 says trust "lands" may not be sold. Of course, the people could  perhaps out of conservational, environmental, or aesthetic concerns  amend the Constitution to overrule Dantzler and prohibit the sale of timber from sixteenth section lands, and if they did so we would likely defer. But if such language were added, it would mean that the timber from trust lands could never be cut, sold to anyone, at any time, for any reason. This would create a serious impediment to the state trustee's ability to exercise its duty of prudent management, that is, of course, if we measure prudence in terms of income production.
Turn from "sale" to "lease." Section 211 says sixteenth section "lands" may not be leased for a term "exceeding twenty-five (25) years."[3] Again practice provides that growing timber cannot be "lands." When one leases property  real or personal  the basic idea is that the lessee can use that which he leases and, at the end of the term, he returns it to the lessor in the same condition in which it was leased, reasonable wear and tear excepted. See Gray v. Edgewater Landing, Inc., 541 So.2d 1044, 1045 (Miss. 1989). If the growing timber is "leased," when the lease term ends, the state qua trustee would have to reclaim all of the beams and boards, a part of so many buildings and houses, not to mention the papers that may be found in libraries (and in law books) made from the pulpwood cut from the sixteenth sections. Constitution makers are presumed not to enact nonsense absent much clearer indications than we have here. At the level of practice, Dantzler was right when it read "lands" as "simply the soil itself." Dantzler, 97 Miss. at 381, 53 So. at 2.
This brings us back to the task at hand, reading Section 211's "lands" in an oil and gas setting. In today's case the state as trustee, acting via Jones County, "leased" lands and minerals to Chevron's predecessor in February of 1957, and, since that time, seven productive wells have produced an aggregate of approximately 1.5 million barrels of oil and 400,000 million cubic feet (mcf) of gas. Chevron has refined this *654 production and has sold it to consumers, and in this light it is of value to think of the nature of the conveyance back in 1957. If the oil, gas and other minerals within the subsurface of Section 16, Township 9 North, Range 11 West, be "lands" within Section 211, the state would have no authority to sell them  in place or upon capture  to Chevron, its predecessor or anyone else. Similarly, if these minerals were "leased" to Chevron's predecessor, then at the conclusion of the twenty-five (25) year term, Chevron was required to return these minerals to the schools in their original condition, reasonable wear and tear excepted. The suggestion seems silly because it is silly.
Again, nothing would prohibit the people through established processes from enacting that subsurface oil, gas and minerals beneath sixteenth section lands may never be sold, period. This would stop the schools from realizing any income from these valuable resources. Still, nothing in the nature of state law prohibits the legal practice of economic folly, although getting around the federally imposed state trustee's duty of prudent management might take some doing.
In the context of timber, a public policy consideration to which we have become more sensitive over the years may justify preservation of our forest lands and thus call into doubt limiting "lands" so as to exclude the timber growing thereon. No one has suggested there is any reason why we ought keep the state's oil, gas and other mineral resources trapped beneath the subsurface in perpetuity, nor do we perceive any. Subject to the interests of surface owners or lessees, and, as well, to the state's legitimate policies regarding conservation and equity in oil and gas development, public policy powerfully supports production if this may legally be done.
Can there be serious doubt that Pace was right when it read "lands" as "simply the soil itself?" Pace, 191 Miss. at 809, 4 So.2d at 278. At the level of fit? Of best justification? Of practice? Still "the majority" reads Section 211's "lands" as including subsurface oil, gas and minerals. This reading renders these trust assets unproductive in perpetuity. If this be so, it would seem the State has a responsibility to pursue those responsible in the past for the conversion and sale of these trust assets and hold them in damages,[4] if not criminally.

IV.
Of course, none of this nonsense arises (outside Mississippi) because an oil and gas lease is not a "lease" of oil and gas. Until today, no one here had seriously suggested otherwise, although I concede the label unfortunate,
... inasmuch as it tends to give the impression to the uninformed that the relationship arising between the parties to an oil and gas lease is the same as that of landlord and tenant under a common law lease of land, whereas, except in Louisiana, the dissimilarities are more important than the similarities.
I Williams & Meyers Oil & Gas Law § 202.1 (1989). As to the minerals, "an oil and gas lease is a `deed' as such term is usually employed." It may be described in real property terms as a conveyance of an "estate in fee simple defeasible." I Williams & Meyers, supra at § 207. All of this is subject to modification by contract. See Thornhill v. System Fuels, Inc., 523 So.2d 983, 1004-05 (Miss. 1988) (Robertson, J., concurring). The grantor of an oil and gas lease could write his conveyance so that his grantee acquired no title except upon production, a rule of capture, if you will, and if he did so we would be obligated to enforce it.
The instrument Chevron holds grants a lease of the surface. No wording per se "grants, bargains and sells all oil, gas and other minerals to lessee/grantee." The instrument does read that the surface leased "unto Lessee [is] for the purpose of ... exploring ... and producing oil, gas and all other minerals... ." More to the point, the language empowers the lessee to make various improvements to the land such as may *655 be reasonably necessary that lessee may "produce, save, take care of, treat, transport and own said products, ... ." [Emphasis supplied] With this language, the only fair reading we may give the instrument is that the state as trustee conveyed title to the lessee [Chevron] in the "oil, gas and other minerals." Only if these minerals are Section 211 "lands" does any of this raise eyebrows.
Unless by contract parties provide otherwise, this state's law declares an oil and gas lease as a sale of an immediate possessory interest in the oil, gas and other minerals which may be produced from under a certain tract of land, subject to specific conditions, together with an easement across the land for ingress and egress and drilling and producing operations. In many ways it is comparable to a timber deed. It effects a sale of the product of the land, not a sale of the land itself, the same as a sale of the timber. Like timber, the value of minerals is in selling them and consuming them. Unlike timber, minerals are not renewable resources, nor may they be used over and over like the soil itself.
Assuming sale is (and must be) permissible, the outcome determinative questions in this litigation are whether and when the state as trustee passed title to the minerals to its "lessee." Again, this is a function of contract, but absent contract Mississippi is an "ownership in place" state. A mineral owner's conveyance ordinarily vests in the grantee title to the minerals while they remain in the ground,[5] and such a grantee's title is then as real and perfect as that of any surface grantee. See Lloyd's Estate v. Mullen Tractor and Equipment Co., 192 Miss. 62, 84, 4 So.2d 282, 288 (1941). The Constitution may preclude this view, but I do not see that it has done so. Similarly the legislature may say, "No," as in Stokely v. State ex rel. Knox, 149 Miss. 435, 115 So. 563 (1928). Here, the legislature has said a resounding, "Yes!"
What this means is that, effective February, 1957, the state/trustee/grantor parted with all right, title and interest in and to the oil, gas and other minerals beneath Section 16, Township 9 North, Range 11 West. Obviously, this includes the oil and gas produced since 1957 and that still beneath the surface, subject to the conditions of the conveyance. I know of no principle that prohibits a party holding perfect title to that to which he has no access, and, indeed, the law is full of doctrines that in such extreme circumstances grant a right of access. See, e.g., McNeese v. Renner, 197 Miss. 203, 217-18, 21 So.2d 7, 8 (1945), (recognizing right of mineral owner to reasonable access to the surface for purpose of exploring, removing and marketing minerals); Quin v. Sabine, 183 Miss. 375, 382-83, 183 So. 701-02 (1938) (where a person conveys an interior lot to another, the purchaser by implication acquires a "way of necessity" from his land to the public roads as the owner of such property has the right to use, occupy and enjoy it, he must necessarily have a right of ingress and egress.); and Pleas v. Thomas, 75 Miss. 495, 500, 22 So. 820, 821 (1897) (same).
The view of my colleagues in the "majority" is anomalous. Their implicit premise is that the state trustee has forever parted with title to all oil, gas and minerals produced since 1957 but retains all that remains below the sixteenth section's surface. This might be fine, well and good if Mississippi were a capture state, if our law provided that title passes upon production. I would concede the premise if there were language in the lease providing that title not pass until capture, as I regard our ownership in place rules subject to modification by contract. See Thornhill, 523 So.2d at 1004-05. I have searched the public and private positive law and find no premise enforceable today providing that title to any minerals beneath Section 16, Township 9 North, Range 11 West remained in the state after execution of the conveyance  the oil and gas lease  back in *656 February of 1957. This can only mean the "majority" is "flatly wrong." It follows that no legal premise supports the "majority" view that the state has conveyed title to what Chevron has discovered and produced while at once retaining title to what is left in the ground.
Folly of a different sort attends the "majority's" chameleonic view of minerals as Section 211 "lands." The law of the state has never been able to repeal the laws of economics, despite our many mighty efforts toward that end.[6] When there is available capital, adequate information, plus a substantial opportunity for profit in excess of risk, all in a stable and facilitating market (and legal) environment, investment will occur. Whether this be a function of Adam Smith's invisible hand or congruent behavior patterns of a society of rational wealth maximizers, it is predictably so.
In this view the "majority" reading of "lands" can (and will) be easily evaded. All the state and its school boards will have to do is declare themselves in the oil and gas business and then enter drilling and production contracts with private producers on terms economically identical to those which obtain in conventional oil and gas "leases." The state trustee could retain title to the minerals in place, the production, and do the selling itself and either "sell" the producers the seven-eighth or thirteenth-sixteenth share or whatever the market may be at the moment or, after sale to consumers down the line, pay the monetary equivalent thereof. Any lawyer who could not draft an oil and gas production contract along these lines, one which would withstand constitutional scrutiny (assuming the majority's reading of "lands"[7] remains stable), should retake first year Property and Contracts.

V.
There is a point where I must part company with Justice Blass. If we read Section 211's word "lands" as including the soils only, as I believe we must, there is no rule of real property which has the power to avoid Section 211's prohibition on sale or impermissibly lengthy leases.
Section 211 places temporal limits on "leases." "Lease" connotes a grant for a term of exclusive rights in the surface. In this view, there is no way around the fact that the state acting via Jones County had no legal power to grant exclusive rights in the surface which exceeded twenty-five (25) years in duration. Justice Blass cites our rule to the effect that, where mineral and surface estates are severed, the mineral estate is dominant. McNeese v. Renner, supra. This rule obtains in the case of private property, but we have no power to declare its potency to dominate trust lands protected by federal compact and state constitution. To the extent Chevron claims exclusive leasehold rights in the surface of Section 16, Township 9 North, Range 11 West, Section 211 decrees those rights expired as of February, 1982, notwithstanding the wrath of oil man or God descend upon us.
We are aware that oil companies often think of their surface rights in non-exclusive easement terms. For drilling purposes the company must have exclusive possession of but a small area, perhaps an acre or less, and beyond this needs nothing beyond a non-exclusive easement. What Chevron needs and may think it has, however, must yield to the language of the lease. Williams & Meyers provide context:
The typical oil and gas lease and mineral grant (or reservation) and an occasional royalty grant (or reservation) will expressly provide for certain easements of the lessee or mineral or royalty owner in the surface. The scope of such express easements varies considerably. A royalty owner may be given an easement of *657 ingress and egress to well locations so that he may inform himself concerning the state of exploration, development and production operations. Mineral owners and lessees are usually given more extensive easements inasmuch as their operations require the use of the surface for a well site or sites, machinery, pipe lines, roads, etc.
I Williams & Meyers, supra at § 218. (Footnotes omitted)
When the State executes an oil and gas lease, it necessarily grants its lessee an easement across the lands for ingress and egress and drilling and producing operations. That easement is a "privilege without profit," as far as the surface or soil is concerned. An oil and gas lessee would not have the right to grow crops on the surface or build an office building. Ordinarily the state may grant simultaneously an agricultural lease or other surface lease, coterminus with an oil and gas lease. Pace resolves  in favor of the oil and gas lessee  what happens when a dispute arises over the use of the surface under these circumstances. There is no constitutional bar to the granting of an easement across sixteenth section lands, though statute provides that fair value be paid therefor. Miss. Code Ann. § 29-3-91 (Supp. 1990).
As before, parties may by contract eschew resort to the public law (except bars of constitutional and statutory dimension) and make their own bed. The "lease" instrument at bar provides that the State, as lessor
... hereby grants, lets and leases exclusively unto Lessee the land hereinafter described, for the purpose of prospecting, exploring, investigating, drilling and mining for and producing, taking, saving, storing, treating, processing and owning oil, gas and all other minerals together with all privileges, rights and easements, etc... .
This language may limit the purposes for which lessee may use the surface, and permissibly so, but it places no limits on the exclusivity of his occupancy. It imports an exclusive lease of the sort Section 211 limits in time, and I am no more willing to surrender common English usage to the mysteries of the world of oil and gas than I have ever been. See Knox v. Shell Western E & P, Inc., 531 So.2d 1181, 1189-90 (Miss. 1988) (Robertson, J., concurring); Thornhill, 523 So.2d at 1007-08. The matter is easily remedied hereafter, however, as oil companies may modify the language of their leases that they take only what they need.
Our laws otherwise governing the lease of surface lands regulate Chevron's rights to continued access. See Miss. Code Ann. § 29-3-99 (Supp. 1990). It is possible that someone may outbid Chevron for the surface, although, if my view were to prevail, Chevron would still own the oil and gas beneath. If the state wished to continue to receive royalties, it would have to sell Chevron a new (and real) easement. One way or another, if the laws of economics decree it feasible, lawful bargaining would take place yielding Chevron continued access and the school board continued revenues.

VI.
There is a final matter, at best marginally informing interpretation, but worthy of note. The lease contains a clause which reads:
Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and fixtures, including the right to draw and remove all casing... . (lease paragraph 7)
If the surface lease terminates after twenty-five years, and is not renewed, the present lessee may shut down each producing well, plug it, remove all its equipment, remove all of the casing, pack up its geological data, and leave the state with nothing but its statutory right to advertise for a new lease. The present lessee could, of course, bid or not. The covenants for prudent development would terminate with the lease.
Whether a new company would want to drill a completely new well to a partially depleted reservoir is problematical. Oil field wisdom seems to be that old oil wells *658 are like old cars. As long as you keep them running they will continue to run indefinitely. Park one for six months, and all the mechanics in town will not be able to get it to run again.
Under the "majority" view, an operator is confronted with the certain knowledge that the lease will terminate after twenty-five years. If the operator is in doubt whether he will be the successful new bidder, or if the economics of producing the reservoir are uncertain, common sense suggests that in the last few years prior to expiration, he will start winding down. Likely such an operator will not make any expensive work-over operations, nor pursue plans for secondary or tertiary operations, nor make expenditures for expensive equipment to raise the pressure of gas so that it will enter gas pipelines, etc. In practical effect production will, for all practical purposes, cease at the end of the twenty-five year period, if not before.
Some of the fields in Mississippi have produced longer than twenty-five years. The greatest, Tinsley, was discovered in 1939 and is still producing. Oil fields have a period of primary production caused by the drive mechanisms found naturally in the formations. Secondary recovery operations have been used with water floods, gas injection, and other means. Tertiary methods are now being tried in an effort to produce all of the oil and gas possible from the formations. Each step may cover a long period of time, and all should be considered by any prospective lessee in the development of a field. An arbitrary twenty-five year cut-off necessarily affects an operator's expenditures in this regard and will result in less than optimum production from the reservoir. In sum, cutting off the oil and gas lessee arbitrarily at the end of twenty-five years will likely lead to waste, the very thing which the constitutional limitations regarding sixteenth section lands are designed to prevent. It remains a mystery why we would do this, when we have had since Pace a view of the Constitution that fits Section 211's language, proceeds from the best justification that may be imagined why we should have Section 211 today, is largely consistent with oil and gas custom and practice.
PRATHER, J., concurs.

APPENDIX TO DISSENT ON PETITION FOR REHEARING

Filed April 4, 1990
BLASS, Justice, Dissenting:
Because I believe the majority is flatly wrong, I dissent and would answer the posed questions differently.
Three questions are presented for our review.
1. Is the oil and gas lease ineffective beyond February 4, 1982, its 25th anniversary?
2. Does Chevron have the right to continue its drilling operations in the proven oil and gas reservoir (or reservoirs) so as to remove in a commercially reasonable and prudent manner the maximum oil and gas recoverable therefrom?
3. Did Chevron at the time of filing its complaint July 30, 1984, have the right to prospect for oil and gas in the non-producing leased acreage or from any other sands?
To answer these questions we must consider Miss. Const. art. VIII, § 211; the terms of the particular lease involved, and whether its provisions can now be changed without the consent of both contracting parties; and whether the Court or the lessor can now take back a portion of the mineral estate which has been conveyed to the lessee. I conclude first that section 211 does not prohibit the execution of a mineral lease, in accord with statutory procedures; and that the lease was and is valid and in full force and effect. The answers to Questions Number 2 and 3 are "yes", for reasons to follow. The decision below should be reversed and judgment rendered here for the appellants.

*659 I.

A.
We are called upon here to re-interpret a section of the Constitution which has been examined in great detail before. In construing a constitution, the leading purpose should be to ascertain and give effect to the intent and the objective designed to be accomplished. Where the language of a constitutional provision is plain, intelligible, and free from all ambiguity, the intent must be taken to be exactly what appears on the face of the instrument, and no process of construction or interpretation is premissible for the purpose of changing that meaning. But if the words of the Constitution, taken in their natural sense are devoid of meaning, or lead to an impossible conclusion, or are contradictory of other parts of the instrument, then it cannot be presumed that their prima facie import expresses the real intention. In that case, the courts are to employ the process of construction to arrive at the real intention, by taking the words in such a sense as will give them a definite and sensible meaning or reconcile them with the rest of the instrument. In so doing, the various possible meanings of the ambibuous words or phrases may be studied, and resort may be had to extraneous sources of information capable of casting light upon the subject. Thus, when a constitutional provision is fairly open to two constructions, one of which would carry out and the other defeat, some great public purpose for which it was designed, the former construction should be adopted. Black Constitutional Law 80 (1927).

B.
We now turn to an examination of Section 211 itself. The word "lands" was subject to more than one meaning, both before and after the adoption of the Constitution of 1890. See Johnson v. Richardson, 33 Miss. 462 (1857); Wheat v. J.J. White Lumber Co., 150 Miss. 615, 116 So. 103 (1928); L.N. Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1, (1910); Gulf Refining Co. v. Terry, 163 Miss. 869, 142 So. 457 (1932); Pace v. State ex rel. Rice, 191 Miss. 780, 4 So.2d 270 (1941).
In Dantzler, 97 Miss. 355, 53 So. 1, decided in 1910, the specific question raised was: "Do the words, `the sixteenth section lands reserved for the support of township schools shall not be sold,' ... prohibit the sale of the timber growing on such land?" 53 So. at 2. In determining that these words did not prohibit the sale of timber, the Dantzler court acknowledged that the word "lands" at common law includes the soil and its natural produce, then states that in construing a Constitution, "words having a certain and definite meaning at common law should, when used in a Constitution, be given that meaning, unless it is clear from the instrument itself that same are used in a different sense." Id. The court then noted that the purpose for the prohibition of 211 was to insure "... the receipt by the schools of a stated revenue, either annually or at comparatively short intervals of time." Id.[1a] On examining Section 211 in this context, the court concluded that the framers of the Constitution could not have meant to prohibit the sale of timber when to do so would deprive the schools of any revenue, thus violating the trust assumed when the state accepted the lands.
In 1932, in Gulf Refining Co. v. Terry, 163 Miss. 869, 142 So. 457, the question before the court was, "May the owner of land after leasing it for a term of years, without any restriction in the lease on the lessee's right to the possession and occupation thereof, drill for and remove any oil or gas that may be therein, and thereby exclude the lessee of the land from the possession of so much thereof as may be necessary for the removal of the oil and gas therefrom?" 163 Miss. at 885, 142 So. 457. This question was answered in the negative by reference to the possessory rights of a *660 surface leasee and to the common law meaning of the word "land" as opposed to the interpretation of that term in the context of Section 211 Miss. Const. of 1890. In arriving at their decision, the prevailing three judges in Terry, acknowledged and accepted the restricted interpretation of "land" in Dantzler, stating:
In order to decide the question (in Dantzler) it was necessary for the court to determine the meaning of the word "lands" as used in the constitution. A majority of the court admitted that its usual meaning was as there set forth by Judge Anderson; but held, giving its reasons therefor, that it was used in that section of the Constitution in a more restricted sense, and was not there intended to include trees growing on the land.
163 Miss. at 887, 142 So. 457.
The dissent more sharply illustrates the accepted view of this interpretation of "lands":
Although section 211 of the Constitution prohibits the sale of these sixteenth section lands, yet this court is committed to the doctrine that the sale of the timber growing on the land is not within the prohibition of said section of the Constitution, and that the word "land" as used in that section, was in its restricted sense, meaning not the soil including everything above and below it, but simply the soil itself.
163 Miss. at 904, 142 So. 457.
In Pace v. State ex rel. Rice, 191 Miss. 780, 4 So.2d 270 the court directly addressed the question of the application of Section 211 to mineral leases:
The third question raised by the appellants is whether Sections 6762 and 6763, Code of 1930, under which appellees assert their right to go upon the land and drill for oil and gas, are unconstitutional, in that they authorize (1) a sale of these minerals in situ, as a part of the realty, and (2) that the lease may under its terms remain in force so long as oil and gas are produced on the land, and therefore perhaps for longer than twenty-five years, all in violation of Section 211 of the State Constitution which prohibits either a sale of any part of the sixteenth section lands, or a lease thereof for a period of more than twenty-five years.
Answering the first of these objections, it was held in the case of Dantzler v. State, 97 Miss. 355, 53 So. 1, 2, involving the right of a board of supervisors to sell timber from these lands, that the framers of the constitution "were dealing with lands nearly all of which were primarily agricultural lands, valuable only as such, and they intended to prevent the sale of the things out of which crops, annual or perennial, are produced. The word "lands," therefore, was used in that restricted sense in which it is so frequently used in common parlance, meaning, not the soil and everything above and below it, but simply the soil itself. The prohibition, therefore, extends only to the land, using the term in this restricted sense, and not to the timber growing on the land."[2a]
191 Miss. at 808, 4 So.2d 270.
The Pace court noted that timber is as much a part of the realty while standing as are oil and gas in place beneath it, and concluded that the legislature had the power to authorize the withdrawal and disposition of minerals from beneath the surface. 191 Miss. at 809, 4 So.2d 270. In arriving at its decision, the Pace court overruled conflicting portions of Gulf Refining v. Terry, stating that the governmental purpose of providing revenue to schools by the development of minerals beneath sixteenth section lands was proper and advisable. 191 Miss. at 810, 811, 4 So.2d 270. An examination of the dissent in Pace, written by the majority author in Terry, indicates that the point of dissent was not the application of § 211 to mineral leases, but the right of the surface lessee to the exclusive possession and occupancy of the "land", *661 meaning the surface estate. 191 Miss. at 812-13, 4 So.2d 270.

C.
We are called upon once again to examine that which we thought settled by Pace. As reiterated most recently in Hill v. Thompson, 564 So.2d 1 (1989) the historical facts relevant to the administration of Sixteenth Section School Trust lands must be considered in a determination of any decision regarding the use of those lands. It is not necessary to reprint the concise history found in Hill and Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). What does require repetition is the fact that these lands are held in trust for the benefit of public schools, and are to be prudently managed to maximize the income therefrom.
The source of Miss. Const. of 1890 § 211 was Miss. Const of 1817 § 20 which states:
That the General Assembly shall take measures to preserve from unnecessary waste or damage such lands as are, or may hereafter be granted by the United States for the use of schools, with each township in this state, and apply the funds which may be raised from such lands by rent or lease, in strict conformity to the object of such grant, but no lands granted for the use of such township schools, shall ever be sold by any authority in this state.
(emphasis added)
Article VIII, Section 211 of the 1890 Constitution presently provides in pertinent part:
The Legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, .. ., and shall provide that the sixteenth sections lands reserved for the support of township schools, except as hereinafter provided, shall not be sold nor shall they be leased for a longer term than ten (10) years for lands situated outside municipalities and for lands situated witin municipalities for a longer term than ninety-nine (99) years, for a gross sum; .. . but the Legislature may provide for the lease of any of said lands for a term not exceeding twenty-five (25) years for a ground rental, payable annually, ... ."
The section further provides that the Legislature may, for industrial development, authorize the sale, in whole or part, of these land and directs that the Legislature shall either purchase other lands in lieu of the lands sold or provide for the investment of the proceeds of such sale for the benefit of the township schools. In addition, the section provides that the Legislature may authorize leases for terms not to exceed ninety-nine (99) years, for industrial development.
Section 211 of the Constitution of 1890 originally stated:
The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, or land granted in lieu thereof, in the Choctaw purchase, and shall provide that the sixteenth section lands reserved for the support of township schools shall not be sold, nor shall they be leased for a longer term than ten years for a gross sum; but the legislature may provide for the lease of any of said lands for a term not exceeding twenty-five years for a ground rental, payable annually; and, in case of uncleared lands, may lease them for such short term as may be deemed proper in consideration fo the improvement thereof, with right thereafter to lease for a term or to hold on payment of ground rent.
(1817, Art. VI., sec. 20)
This section of the 1890 Constitution is addressed to three separate situations: (1) sixteenth section lands shall not be sold; (2) the lands shall not be leased for a gross sum for a longer term than either 10 or 99 years, depending on the location within or outside of municipalities; (3) the lands may not be leased for an excessive term of years for a ground rental, payable annually.
The nature and character of the estate conveyed by an oil and gas lease was determined in Stokely v. State ex rel. Knox, 149 *662 Miss. 435, 446, 115 So. 563 (1927). "Under this instrument the title to seven-eights of the oil in the land is vested in the grantee ... Under the provisions of the instrument the rights conferred thereby continue so long as oil or gas, or either of them, is produced on said land, provided drilling was commenced by a fixed date. Under this provision, the termination of the grant is wholly uncertain, and the rights granted may endure forever."
A forthright reading of section 211 indicates that the oil and gas lease is not included in situations two and three described above. This conveyance is not a lease for yearly ground rental, payable annually, neither is it a lease for a term of years for a gross sum. Obviously, § 211 has to do with ground or surface leases only. It has never covered or prohibited oil and gas leases. Part of the language must be distorted and part discarded to force an oil and gas lease into this mold.
As stated above, the oil and gas lease is a sale of the minerals, in situ, a determinable fee. If we interpret the word "lands" as including the minerals in place, section 211 would prevent any mineral development of sixteenth section lands. These lands are held in trust by the State for the use and benefit of the public schools of the township. This result would defeat the purpose of the trust, which is to provide a continuing source of income for the support of the public schools in Mississippi, thus violating the federal mandate. This Court has up to this point held that the prohibition against sale applies only to the sale of the surface of the land.[3a]
In both Pace and Dantzler, it was acknowledged that the economic value of minerals and timber, respectively, is derived, not from possession alone, but from production of these assets, this is certainly no less true today. As stated in Dantzler:
It is also hardly possible that it was meant by this section of the Constitution to prohibit the sale of timber, when ... the sale of the timber would constitute the only source of revenue therefrom ... To do so would deprive the schools ... of any revenue therefrom, and convict the state of having, .. . violated the trust which it assumed when it accepted these lands.
53 So. at 2.
Like the sale of timber, the sale of minerals does not convey any portion of the land itself, but only the minerals contained in the land, literally the minerals are contained in the spaces within the solids which make up the subsurface strata.[4a]
A regular mineral conveyance does not transfer title to a portion of the subsurface space, but merely to the minerals occupying that space. So neither the owners of the minerals nor their assignees had the right to use the space vacated by the removal of the mineral as a storage for gas.
1A Thompson, On Real Property, 3 § 155 (1980).
The surface land, by its nature is not consumed by productivity, as are timber and minerals. The surface, in and of itself, has lasting value and potential. The value of timber and minerals is realized by production. The holdings in Pace and Dantzler which permit economic use of these resources recognized that the application of the prohibition in Section 211 would defeat its purpose. We can do no less today.

E.
Pace was decided in September, 1941. Section 211 was amended in 1942. House Concurrent Resolution No. 9 was adopted *663 by the House of Representatives on January 13, 1942 and by the Senate on February 5, 1942. The wording of the first part of the section was not changed, but the sentence below was added:
Provided, however, that lands granted in lieu of sixteenth section lands in this state and situated outside of the county holding or owning the same may be sold and the proceeds form such sale may be invested in a manner to be prescribed by the legislature.
In this same term of the Legislature, House Bill No. 688 was approved on March 23, 1942. This bill amending section 6762 of the Mississippi code of 1930 (the section examined in Pace) provided that sixteenth section lands, "... shall not be leased for oil, gas and other minerals for a primary term of more than six years and so long thereafter as oil or gas or other minerals is being produced from said lands; and the royalties to be paid shall not be less than (A) on oil, 1/8 of that produced and saved from said lands; (B) on gas, ..., the market value at the well of 1/8 of the amount realized from such sale; (C) on all other minerals mined and marketed 1/10 either in kind or value at the well ..."
Section 211 was amended in 1944 to allow the leasing of sixteenth section lands situated in municipalities for a term not exceeding 99 years and again in 1961 to establish a procedure for the sale and lease of sixteenth section land. In each amendment, the language examined in Pace was re-adopted without change.
"The adoption of constitutional language similar to that in a former constitutional provision is presumed to incorporate authoritative judicial construction of the former language." Sarracino v. Superior Court of Los Angeles Co., 13 Cal.3d 1, 118 Cal. Rptr. 21, 26, 529 P.2d 53, 58 (1974); Accord Garrett v. Miss. State Highway Commission, 227 So.2d 856, 857 (Miss. 1969); McDaniel v. Beane, 515 So.2d 949 (Miss. 1987). Thus the Pace interpretation is now ratified and confirmed by these amendments. Although it is clearly the law, the majority opinion simply fails to recognize it.
There is nothing before us which would rebut this presumption. The interpretation of the word "lands" in Pace inures to the benefit of the school trust and we can see no reason to change it.

II.

A.
The Chancellor erred in restricting Chevron's right to further explore for oil and gas.
The lease at issue here is a "standard" form "Producers 88 Rev." lease. The primary term is six (6) years. The secondary term is for: "so long as either or both of the following conditions shall prevail without cessation or interruption of more than three consecutive months: (a) so long as oil, gas or other mineral, or any one or more of them is produced from said land hereunder; (b) so long as Lessee is engaged in drilling, mining or reworking operations on said land hereunder." See Summers, Oil and Gas, § 292-298 (1959). There is no charge or suggestion of fraud or misconduct in the granting and procurement of the lease. A bonus in excess of $22,000 was paid to the schools for it.
Under the "unless" form of lease, such as this one, the lessee is under an absolute obligation to drill before the end of the year, or pay the contractual "delay" rent at the end of each year of the primary term, or the lease terminates, as is provided by its terms. Hemingway, The Law of Oil and Gas, 223 (1971). The drilling and reworking provisions aside, in order to satisfy the habendum clause of the lease and keep the lease in effect past the end of the primary term and into the secondary term, it is necessary that oil, gas, or other minerals be produced from the demised land. Summers, supra, § 295. Eight oil wells have been drilled on the land, and seven of them are still producing. More than a million dollars has been paid to the schools as royalty. According to its terms, the lease remains in effect and will continue "so long as" production continues.
*664 There is no proof or charge of any failure to develop the lease as a prudent operator would, and there has been no demand for the development of other sands.[5a] Indeed, as we have said, the record shows that the operator of the lease contemplated testing much deeper underlying sands, and filed this suit in order to make certain that its right to do so would not be called into question. It is common knowledge that deep drilling is very expensive, and the record here indicates that the contemplated well would cost in excess of $7,000,000. It was not imprudent of Chevron to seek confirmation of the title before incurring these costs. Whether the lease will continue to be recognized is the question we now address.
We have seen that the lease appears, by its terms, to still be in effect. We know that it was executed in full compliance with statutory authority and for substantial consideration and provided for a primary term, delay rental, and secondary term which conformed to the statute. We know that it has been substantially developed, and no action has been brought against the lessee, nor any complaint made, so far as the record shows, for any failure to perform any obligation of the lessee under the lease. It is undisputed that oil is still being produced from the lands and under this lease. The ordinary habendum clause does not place a duty upon the lessee to drill any particular number of wells as a condition precedent to the continuation of the lease beyond the primary term. The lessee is under a duty to drill sufficient wells to reasonably develop the premises and to protect from drainage by wells on adjoining lands. Summers, supra, §§ 391, 391, 398 and 399. There is no charge that this duty has been violated. The parties agreed that the lease would continue to be in effect so long as production continued, in an agreement which was also a conveyance, entered into in good faith, by officers authorized to act, pursuant to a valid statute, and carried out in good faith for over twenty-five years.
Having fully complied with the terms of the contract, Chevron retains the right to continue exploration and drilling on the demised property.

B.
It is settled that Mississippi, like Texas, is an "ownership in place" State, that an oil and gas lease conveys a determinable fee in the minerals underlying the land. Mississippi and Texas find that the interest of the lessee in an oil and gas lease is a corporeal possessory interest. Stokely v. State, 149 Miss. 435, 115 So. 563 (1928); Lloyd's Estate v. Mullen Tractor and Equipment Co., 192 Miss. 62, 64, 4 So.2d 282, 288 (1941); Hall, The Application of the Determinable Fee Theory in Construing the Mississippi Mineral Lease, 19 Miss.L.J. 291 (1948); Stephens County v. Mid Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290; Walker, Nature of Property Interests Created by an Oil and Gas Lease in Texas, 11 Tex.L.Rev. 399 (1933).
The quantum of ownership of the mineral estate may be denoted by percentage interest, undivided interests, or a particular number of acres of royalty or minerals. Hemingway, supra, at 81. This conveyance, not so denoted, conveys the whole. "The interest which a grantor purports to convey is determined by the scope of the granting language less any reserved or excepted interests." Hemingway, supra, at 96. The lease in question says, "This lease covers all the interest actually owned or claimed by Lessor ..." It seems clear, then, that it includes all sands at all depths. At this time and until the fee is terminated, therefore, these minerals, at all levels, belong to the lessee, as real property, unless the state has the right to repudiate its conveyance and take the property away from its grantee.
*665 Although Pace states that the state owns the minerals in its sovereign capacity, we know that it is acting as trustee and for the purpose of making a profit for the schools when it enters into a mineral lease. Trustees are bound by their contracts and leases like anyone else. G. Bogert, Trusts § 139 (6th Ed., 1987). Further, when the State buys and sells property in the market place, when it contracts about its business affairs, and when it agrees to permit itself to be sued, it steps out of its role as sovereign and stands, like any other litigant, subject to the law and bound by its commitments. The state, in its pleadings in this cause, appears to repudiate the concept that it assumed any obligation whatsoever when it executed the mineral lease. This notion was soundly rejected by the Supreme Court of the United States as early as 1793, when the Court, quoting from Blackstone, said: "A subject ... so long as he continues a subject, hath no way to oblige his prince to give him his due when he refused it; though no wise prince will ever refuse to stand to a lawful contract." Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 442, 1 L.Ed. 440 (1793), rev'd on other grounds, U.S. Const. amend. XI. "If it (the government) comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there." Cooke v. United States, 91 U.S. 389, 398, 23 L.Ed. 237 (1875).
"In conducting transactions with respect to its lands, the State acts in a proprietary and not in a sovereign capacity, and being amenable to all the rules of justice which it prescribes for the conduct of its citizens, it will not be permitted to revoke a grant of lands made upon a valuable consideration which it retains." Cleveland Terminal & V.R. Co. v. State, 85 Oh.St. 251, 97 N.E. 967, 973 (1912).
We know of no authority which permits the court to rewrite the lease without the consent of the lessee. We do not know whether or not the lessee would have entered into the lease as some of us would rewrite it. We doubt that it would. We know that it objects now. We do not know whether any other lessee can be found who will come in and lease all of the sands under the land except those now being produced by the present lessee. To access the lower sands, lessee will have to risk several millions of dollars, and the question must arise as to how safe the lease is, with the one just before it having been repudiated. How will any prospective new lessee regard 16th section leases in the future? What will some other court say in the future with regard to the terms of a lease made today if it should decide that more advantageous terms could have been negotiated?
There were no allegations here, as in Hill v. Thompson, of inadequacy of consideration. To the contrary, all statutory procedures were followed. We think that the law and public policy demand that the public be held to the terms of its contracts, barring fraud or similar misconduct, and that those who deal with public agencies in business and proprietary matters, through officers who are acting within the limits of their authority, are entitled to rely on the agreements they make.

C.
Should the state, or the board of supervisors, be of the opinion that the lessee is not properly developing the minerals, or has otherwise violated the terms of the lease, the vehicle by which the interests of the children of Mississippi can be protected is a suit based on breach of the implied covenants to develop, not by simply repudiating the agreement the fruits of which have been happily received for a quarter of a century. 5 Williams & Meyers, Oil and Gas Law, § 845.8 (1988). The covenant to develop involves two implied covenants: (1) The covenant of reasonable development; and (2) the covenant of further exploration. Id. § 831. As a prerequisite to enforcing the covenant of further exploration, the law requires notice of breach and demand for performance. Id. § 844.4; Wells v. Continental Oil Co., 244 Miss. 509, 142 So.2d 215. See also Sohio Petroleum Co. v. Miller, 237 La. 1015, 112 So.2d 695, 699 (1959); Williams & Meyers § 845.4.
*666 There were neither allegations nor proof of any such breach of these covenants in this case. The chancellor, in addressing Chevron's right to explore to deeper formations stated that it was unreasonable to enforce the lease without the commonly recognized "Pugh clause",[6a] and proceeded to insert one to operate retroactively, not only as to the surface area of the lease, but also to deep horizons, cancelling those portions of the lease. This was done despite uncontroverted testimony in the record that the production by Chevron had been prudent.

III.
The Chancellor erred in holding that the lessee must "renegotiate" the surface access rights.
The mineral estate is still in existence and it does not depend on a surface lease or permit from the surface owner for its utilization. "The conveyance in fee of all or part of the minerals creates a separate and distinct estate." Moss v. Jourdan, 129 Miss. 598, 613, 92 So. 689 (1922); Stern v. Great So. Land Co., 148 Miss. 649, 114 So. 739 (1927); Neal v. Teat, 240 Miss. 35, 126 So.2d 124 (1961). When the mineral estate is severed from the surface estate, by lease or by sale, it is evident that the mineral estate is the dominant estate, because of the nature of the rights conveyed. "The oil and gas lease gives the owner of same the dominant estate." Jones v. Getty Oil Co., 458 S.W.2d 93 (Texas 1970); Union Producing Company, et al. v. Pittman, 245 Miss. 427, 146 So.2d 553 (1962). The owner has a right to explore for and to remove the minerals from the land. To do so he must go upon the land. "The owners of the minerals has [sic] a limited right to use the surface in reaching and removing the minerals." Central Oil Company v. Shows, 246 Miss. 300, 149 So.2d 306 (1963). He has the right to do this and is not, in the absence of a statute or contractual provisions, liable for damage therefor so long as he does no more damage than is reasonably necessary.[7a] This is because of the physical realities of the two estates. The mineral owner has a right to explore and produce, and to do so he must have at least limited use of the surface. He does not need a surface lease under any circumstances. The surface estate is burdened with this right of the mineral estate. "... (A) grant or reservation of mines or minerals gives to the mineral owner the incidental right of entering, occupying, and making such use of the surface lands as is reasonably necessary in exploiting, mining, removing, and marketing the minerals." Union Producing Company, 245 Miss. at 433, 146 So.2d 553. Thus Section 211 has no application to this issue of access and certainly cannot be used to justify the confiscation of this vested property interest.
The majority opinion works a confiscation and exacts a ransom from the lessee. It recognizes the ownership of the minerals and the nature of the dominant estate, while simultaneously exacting a negotiated ransome to continue the mineral operation. No authority whatever is presented in support of this confiscation. Had the confiscation been presented to this court in a brief on appeal, we would be justified in not considering the issue. Th majority purely and simply invents a new rule from thin air.
In conclusion, it is clear that the mineral lease was lawfully executed, and that Chevron has fully performed its contractual obligations. Accordingly, we must reverse the chancellor's cancellation of Chevron's mineral lease and affirm the chancellor's holding that Miss. Const. art. VIII § 211 (1890) does not apply to mineral leases.
PRATHER and ROBERTSON, JJ., join this opinion.
NOTES
[1] When this case was originally decided on April 4, 1990, Justice W. Joel Blass filed a dissenting opinion which I joined. Justice Blass left the Court on December 31, 1990. Our granting of the petition for rehearing has the effect of withdrawing the original opinions. I append hereto Justice Blass' dissent and would add that I continue to concur in the views there expressed, with the exceptions noted above.
[2] The point bears note. The State as trustee/lessor has always held a remedy for the problems (if any) of insufficient or imprudent development. The lease at issue provides:

Lessee agrees to drill such wells, but only such wells, as a reasonably prudent operator would drill under the same or similar circumstances; ... (b) after discovery of oil on said land, in order most efficiently and economically to develop said land.
I regard this but an express of the familiar covenant of prudent development. This covenant devolves a duty upon the lessee oil company, and in this regard, the State as trustee/lessor enjoys a correlative right. See 5 Williams and Meyers, Oil And Gas Law §§ 831, et seq. (1989); 5 Kuntz, Oil And Gas §§ 58.1, et seq. (Rev.Ed. 1978); Shaw v. Henry, 216 Kan. 96, 100, 531 P.2d 128, 131 (1975). If, at any point during the twenty-five year period from 1957 to 1982, anyone  the State or the Jones County Board of Supervisors or perhaps Board of Education  had been of the view Chevron had been lax in exploring and developing the fields, the trustee/lessor had a remedy. The record reflects no demand made under the covenant, raising the question whether the trustee/lessor has prudently managed the trust with proper prudence toward the interests of Jones County's school children.
[3] I recognize that the legislature by statute has implemented the various term limitations provided in Section 211. See, Miss. Code Ann. §§ 29-3-1, et seq. (Supp. 1990).
[4] Trying to imagine the measure of such damages is an enlightening thought experiment.
[5] For a caveat not relevant today, see The California Company v. Britt, 247 Miss. 718, 727, 154 So.2d 144, 147 (1963) (recognizing a rule of capture to the effect that owner of land acquires title to oil and gas produced from wells on his land, though part of the oil and gas may have migrated from adjoining lands).
[6] I have noted the point from time to time. Denley v. Peoples Bank of Indianola, 553 So.2d 494, 497-98 (Miss. 1989) (Robertson, J., concurring); Galloway v. Travelers Insurance Company, 515 So.2d 678, 686 (Miss. 1987) (Robertson, J., concurring).
[7] As noted above, if oil and gas really are Section 211 "lands," all sales are banned, and, if leased, the oil and gas must be returned at the end of the term, reasonable wear and tear excepted.
[1a] This statement was quoted and expanded in Pace, making clear the concept that the intent was to prevent the "sale of the things out of which crops ... are produced." 191 Miss. at 808, 4 So.2d 270.
[2a] The majority opinion cites, emphasizes, then totally ignores or even repudiates this language. The proposed holding is in direct conflict with the plain language quoted here. This repudiation is accomplished without overruling, or even distinguishing, Pace and/or Dantzler.
[3a] The royalties derived from mineral leases are placed in the "principal fund", to be invested; and the interest derived therefrom to be expendable by the school district, thus preserving the trust. Miss. Code Ann. §§ 29-1-111 and 29-3-113.
[4a] The majority refers to the Lessee as the owner of only the oil and gas produced, but immediately following recognizes that this court has held that the lessee acquired a present possessory interest, limited in scope but superior to that of the lessor, in the surface of the lands, as well as an estate in the minerals in place. The majority later confiscates part of the mineral estate and repudiates the mineral owner's surface rights. This is, with all due respect, incongruous.
[5a] A careful reading of the Chancellor's holding, quoted in the majority opinion, leads me to conclude that the duration of title of any and all mineral leases in Mississippi, after production commences, is wholly uncertain, but will extend only for a "reasonable time", to be defined by this court. Experience indicates that this is an uncertain period indeed. Such titles would scarcely support a %5 to $10 million investment, and in my opinion are totally unmerchantable.
[6a] See 4 Williams & Meyers § 669.14 (general discussion of "Pugh clause"). See also § 844.2.
[7a] The lease at issue here provides that Lessee shall pay for damages caused by Lessee's operations to houses, barns, growing crops and fences.